# United States Court of Appeals
## For the First Circuit

Nos. 11-1304, 11-2016, 12-1052

SHAWN DRUMGOLD,

Plaintiff, Appellee,

v.

TIMOTHY CALLAHAN,

Defendant, Appellant,

FRANCIS M. ROACHE; PAUL MURPHY;
PATRICIA A. MURPHY, as Executrix of the Estate of Paul Murphy;
RICHARD WALSH; CITY OF BOSTON,

Defendants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]

Before

Lynch, Chief Judge,
Lipez and Thompson, Circuit Judges.

Joseph L. Tehan, Jr., with whom Jackie Cowin, Gregg J. Corbo,
and Janelle M. Austin were on brief, for appellant.
Michael W. Reilly, with whom Rosemary Curran Scapicchio was on
brief, for appellee.

January 31, 2013

**LIPEZ, <u>Circuit Judge</u>.** In the summer of 1988, twelve-year-old Darlene Tiffany Moore was killed by a stray bullet during a gang-related shooting in Boston. Appellant Shawn Drumgold was tried and convicted of Moore's murder in Massachusetts state court in the fall of 1989. After serving fourteen years of his life sentence, Drumgold moved for a new trial on the ground that exculpatory evidence had been withheld by several Boston police officers involved in his prosecution, including appellee Timothy Callahan, a homicide detective. Drumgold's motion was granted, the district attorney's office declined to prosecute him again, and he was released from prison in 2003.

Shortly after his release, Drumgold filed a civil action in federal district court pursuant to 42 U.S.C. § 1983 against Callahan, Boston police commissioner Francis Roache, police officers Paul Murphy and Richard Walsh, and the City of Boston. Drumgold alleged that his constitutional due process rights were violated by the withholding of material exculpatory evidence during his criminal trial, in contravention of <u>Brady</u> v. <u>Maryland</u>, 373 U.S. 83 (1963). In 2008, a jury determined that Callahan had withheld some evidence but deadlocked on whether his failure to disclose that evidence had caused Drumgold's conviction.[1] As a result, a

---

[1] Drumgold's claims against Murphy were dismissed prior to trial. The claims against Roache and the City of Boston remain pending in the district court. The claims against Walsh went to trial together with those against Callahan, but the jury found that Walsh was not liable. Only Drumgold's claims against Callahan are

mistrial was declared and a retrial held in 2009.  The retrial jury also found that Callahan had withheld evidence and determined that his actions had caused Drumgold's conviction.  Drumgold was awarded damages of $14 million -- $1 million for each year he spent in prison.

On appeal, Callahan argues that he is entitled to judgment as a matter of law on three different grounds, namely, that the withheld evidence is not material within the meaning of Brady, that he is entitled to qualified immunity for his actions, and that the scope of the retrial was too broad.  After careful consideration, we reject these arguments.  However, we agree with Callahan's alternative claim that he is entitled to a new trial because the district court judge erred in instructing the retrial jury on causation.  Accordingly, we remand this case to the district court for a new trial.

**I.**

## A.  The 1989 Criminal Trial

On August 19, 1988, Moore was shot and killed by two masked men while sitting on a mailbox in front of her mother's home in Boston.  Ten days later, city police officers arrested Drumgold and his friend Terrance Taylor.  They were charged with first-degree murder and brought to trial in Massachusetts state court in the fall of 1989.  Phil Beauchesne, an assistant district

relevant for the purposes of this appeal.

-3-

attorney, led their prosecution.  The prosecution's theory of the case, laid out in Beauchesne's opening statement, was that the bullet that killed Moore was intended for Chris Chaney, a gang member who was standing nearby.  Chaney was thought to be responsible, along with a man named Mervin Reese, for the shooting of Romero Holliday, a rival gang member whom the prosecution believed to be an associate of Drumgold's.

At trial, Beauchesne called a series of witnesses who tied Drumgold, and in some instances Taylor, to Moore's murder. One of these witnesses (and the focus of this appeal) was Ricky Evans.[2]  Evans testified that he saw Drumgold and Taylor carrying guns shortly before Moore was killed, about two blocks from the murder scene.  According to Evans, Taylor told Drumgold at that time that he knew where they could find Chaney and Reese, Holliday's supposed assailants.  The next time Evans encountered Drumgold and Taylor, approximately an hour after the shooting, they were no longer armed and Drumgold appeared nervous.  Evans heard Taylor say that their guns were "hot" and had been "stashed" in a safe location.

Evans was impeached with his past criminal activity and other bad acts, as well as with evidence that police officers investigating Moore's murder helped him clear up some outstanding

---

[2] We summarize the testimony of other prosecution witnesses below.

warrants. Taylor's counsel also noted that it took Evans ten months to come forward with information regarding Moore's death and probed his motivation for testifying. Evans explained that he "didn't want to get involved" at first but later changed his mind: "I just felt like [Moore's mother] lost her daughter so why not go and tell the truth when you can. . . . I got a daughter myself and I wouldn't want her to be sitting on the mailbox and get shot."

After the prosecution rested, the state court dismissed the charges against Taylor, finding insufficient evidence to permit a reasonable jury to convict him. Drumgold then testified in his own defense, denying any part in Moore's death. Drumgold offered an alibi, corroborated by his friend Paul Durand as well as by Taylor, that he was drinking wine coolers with Durand outside Taylor's girlfriend's house at the time of the shooting and only later ended up near the murder scene, which was half a block from where his girlfriend and daughter lived. Drumgold also presented third-party culprit evidence suggesting that Moore was killed by two prominent members of Holliday's gang, Theron Davis and London Williams, in a failed attempt to take revenge on Chaney for the attack on Holliday, as well as for an incident in which Chaney stabbed Davis in the hand a month before Moore's death. There was a stipulation at trial that, on the day of Moore's murder, a car dealership loaned Williams a white Suzuki jeep -- the exact type of vehicle that witnesses said the shooters were driving. One witness

testified that Davis and Williams drove past Chaney in the same type of vehicle half an hour before Moore was shot, calling out from the car, "we'll be back." A few hours later, Davis was stopped in a white Suzuki jeep by a Boston police officer.

Once Drumgold concluded his defense, the charges against him went to the jury, which returned a guilty verdict on October 13, 1989, after deliberating less than one full day. Drumgold was sentenced to life in prison.

## B. The 2008 Civil Trial

In 2003, fourteen years after his conviction, Drumgold moved for a new trial in Massachusetts state court on the basis that exculpatory evidence casting doubt on the testimony of several prosecution witnesses was not disclosed to him during his 1989 criminal trial. Drumgold's motion was granted, and he was released from prison after the district attorney's office entered a nolle prosequi, indicating that it was abandoning his prosecution. Drumgold then filed a civil suit in federal district court under 42 U.S.C. § 1983, alleging, as relevant to this appeal, that Callahan violated his constitutional due process rights by withholding evidence that would have discredited Ricky Evans.[3] Drumgold's civil claims against Callahan went to trial in the spring of 2008.

_____

[3] Drumgold also alleged that Callahan withheld evidence regarding two other prosecution witnesses, Mary Alexander and Tracy Peaks. Those allegations were rejected by the jury in the 2008 civil trial and are not pertinent to this appeal.

At the civil trial, Evans testified on Drumgold's behalf that he had perjured himself during the 1989 criminal trial in order to please Callahan.[4]  Evans explained that he first met Callahan in December 1988, when Callahan was investigating the execution-style murder of Evans's cousin by a person named Treas Carter ("the Treas Carter case").  By the time Callahan was assigned to Drumgold's case, about six months later, the two men had become "close like friends."  Evans had also learned that he could profit by aiding Callahan's investigations: "[I]t was like if I told him what he wanted to hear, I could get what I wanted, and I started getting what I wanted so I started giving him what he wanted to hear."

During one conversation about the Treas Carter case, Callahan asked Evans if he had any information regarding Moore's death.  When Evans indicated that he did, Callahan produced a picture of Drumgold and said, "[t]his is the guy here."  According to to Evans, there was no convincing Callahan that Drumgold was not the culprit:

> I knew it wasn't Shawn that had did the shooting that night, you know, because everybody in the neighborhood said it was [Theron Davis].  But it was like [Callahan] wouldn't take, you know, "no" for an answer that it was not Shawn.  You know, he wouldn't take it.  Like, after, you know, when I tell

---

[4] There is no indication in the record that Evans was ever criminally charged with perjury.

him [Davis] did it, it was like I was just pointing at a blank picture.

Some time after this initial discussion -- Evans could not remember exactly when, except that it was on "a summer night" in 1989 -- Callahan arranged for Evans, who was homeless, to stay at a Howard Johnson hotel in Boston. Evans claimed that, during the lead-up to Drumgold's criminal trial, he and Callahan met on several occasions at the hotel restaurant, where Callahan prepared him to testify for the prosecution by feeding him facts that implicated Drumgold in the shooting. In the eight months that Evans recalled boarding at the hotel, he never paid a bill, he was permitted to come and go as he liked, and he was able to charge meals at the hotel restaurant to his room. No one monitored his visitors or kept track of his whereabouts. In addition, Evans testified that, while he was at the hotel, Callahan provided him with money upon request: "If I needed, like, say if I needed money or something, I would just give him a call, I'd call him, and, you know, he'd like, drop me off $30, $40, $50."

These benefits were of great value to Evans in his impoverished state:

> I was living in a hotel I could bring anybody that I wanted to, I mean, I could feed them, my whole family. It was a big deal to me. I was moved off the street into a hotel. I didn't have to worry about nothing. I needed money, I gave them a call . . . . I didn't have anything to worry about, take me off the street and put me in like a five star. See, I was wearing the same clothes every day that

> week, then I get Detective Callahan . . . I
> didn't have to worry about it no more, so I
> told them what they wanted to hear.

None of these benefits were disclosed to Drumgold prior to or during his criminal trial.

Callahan disputed the main thrust of Evans's testimony. He denied feeding Evans any information about Moore's murder or inducing Evans to testify in any particular fashion during the 1989 criminal trial. Callahan testified that he placed Evans in the hotel only a few weeks before the criminal trial -- on September 12, 1989 -- and that he did so out of concern for Evans's safety as a cooperating witness in Drumgold's case, as well as in the Treas Carter case. He also said that he only gave Evans money ($20) on one occasion, because Evans was hungry and had no means to purchase food. Callahan acknowledged that there was no contemporaneous written documentation of either benefit, although he was "sure" he reported to Beauchesne that he had "placed [Evans] in a hotel." He also recalled disclosing Evans's accommodations to the prosecutor assigned to the Treas Carter case, Paul Connolly, who worked down the hall from Beauchesne. A January 1990 memorandum to a witness advocate from Connolly stated: "[Y]ou will remember that our witness Ricky Evans was in need of housing" and "we had in effect relocated him to a hotel." However, neither Beauchesne nor Connolly had any memory of discussing Evans's hotel accommodations with Callahan.

-9-

To help the jury understand the role Evans played in the 1989 criminal trial, transcripts of that proceeding were read aloud during the 2008 civil trial and admitted into evidence as exhibits. Against this backdrop, the district judge sent the case to the jury in two phases. In the first phase, the jury was directed to complete a special verdict form that, in pertinent part, included the following two questions:

> (1) Has the Plaintiff, Shawn Drumgold, proven by a preponderance of the evidence that Defendant Timothy Callahan violated his right to a fair trial by withholding exculpatory evidence from prosecutors, manufacturing evidence, and/or obtaining false statements regarding Ricky Evans being housed at a hotel and provided with meals?

> (2) Has the Plaintiff, Shawn Drumgold, proven by a preponderance of the evidence that Defendant Timothy Callahan violated his right to a fair trial by withholding exculpatory evidence from prosecutors, manufacturing evidence, and/or obtaining false statements regarding Ricky Evans being given substantial amounts of money?

The jury answered "no" to the first question and "yes" to the second. Apprehending the inherent ambiguity in the phrase "substantial amounts of money," the district judge proposed to ask the jury to clarify its response to the second question. When both parties objected, the judge did not seek the clarification.

Proceeding to the second phase, the judge instructed the jury to consider whether Callahan's withholding of evidence concerning the provision of money to Evans had caused Drumgold's

-10-

conviction and, if so, the amount of damages due to Drumgold. The parties presented additional evidence and delivered closing arguments as to causation and damages. After a week of deliberations, the jury reported that it could not agree on the causation question, and the judge declared a mistrial.

Immediately following the declaration of a mistrial, Callahan requested the entry of a final judgment on all issues decided by the jury in his favor. The judge said that Callahan's request seemed appropriate:

> Entry of judgment would make sense with respect to . . . the issues that were finally decided by the jury on Officer Callahan. . . . In other words, when the jury said no liability for Officer Callahan with respect to . . . all aspects of Ricky Evans except for the money, that judgment it seems to me, can enter.

She then addressed the scope of a possible retrial:

> If there would be a retrial . . . I'm not sure that it would be possible to separate out as a matter of fact the issues about the hotel, et cetera, from the issues of money so that a retrial on Officer Callahan I think would cover the entire story, but the only question that that jury would be asked is about the money.

The judge elaborated:

> [E]ven the finding of liability for Officer Callahan on the money would . . . be up in the air because the jury -- that wasn't a complete verdict, there had to have been a verdict of that finding plus proximate cause, so that's not a complete verdict, and judgment should not be entered one way or the other with respect to that.

However, when it later became clear that a retrial would take place, the judge declined to enter judgment in Callahan's favor on any issues relating to Evans that were decided in the 2008 trial. She ruled that the retrial would not be limited to the causation question on which the first jury hung, but also would revisit the antecedent question of whether Callahan withheld evidence that he gave Evans money, as well as the question of whether he withheld evidence that he housed Evans at a hotel.

## C. The 2009 Retrial

The retrial was held in September 2009. Much of the evidence mirrored the evidence in the 2008 civil trial, including transcripts from the 1989 criminal trial. Evans repeated his prior testimony that he perjured himself during the criminal trial in order to curry favor with Callahan, that Callahan fed him information implicating Drumgold in Moore's murder, and that Callahan housed him for eight months at a Howard Johnson hotel and gave him money "whenever [he] needed it." Evans also testified that he informed Callahan that "everybody in the neighborhood" believed Theron Davis had killed Moore, but Callahan was "possessed with Shawn Drumgold": "[T]he only person that he wanted to hear about was Mr. Drumgold. He didn't want . . . to hear anything about [Davis], he wanted to finger Shawn."

Callahan again denied having fed Evans any information or provided any inducements to him. He testified that he placed Evans

in the hotel only a few weeks before the criminal trial and that he did so in order to "guarantee not only his safety but his attendance before the court." Callahan also testified that he disclosed Evans's accommodations to Beauchesne and to Connolly, although he did not document that benefit in a written report. He added that the only occasion on which he gave Evans money (again, $20) was when he first took Evans to the hotel, because Evans had not eaten that day. The attorney who had represented Drumgold at his criminal trial testified that, even if he had known Callahan gave Evans $20 for food, "that . . . probably would not have been an area that [he] would have gone into" in cross-examining Evans.

The judge again sent the case to the jury in two phases. The special verdict form used in the first phase included the following questions:

> (1) Has the Plaintiff, Shawn Drumgold, proven by a preponderance of the evidence that Defendant Timothy Callahan intentionally or recklessly withheld exculpatory evidence from prosecutors regarding Ricky Evans being housed at a hotel and provided with meals?

> (2) Has the Plaintiff, Shawn Drumgold, proven by a preponderance of the evidence that Defendant Timothy Callahan intentionally or recklessly withheld exculpatory evidence from prosecutors regarding money given to Ricky Evans?

-13-

The jury answered "yes" to both questions.[5]  As a follow-up to the second question, the special verdict form directed the jury to determine the amount of money Callahan gave Evans.  The two choices were "$20" and "more than $20."  The jury marked "$20."  The special verdict form then put these questions to the jury:

> (3) Has the Plaintiff, Shawn Drumgold, proven by a preponderance of the evidence that the evidence withheld by Defendant Callahan was material?
>
> (4) Has the Plaintiff, Shawn Drumgold, proven by a preponderance of the evidence that the evidence withheld by Defendant Callahan was a legal cause of Mr. Drumgold's conviction?

The jury answered "yes" to both questions, finding Callahan to be liable.  That finding concluded the first phase of the retrial.  In the second phase, the jury awarded Drumgold $14 million in damages.

This appeal followed.  Because there was no "final decision" that could be appealed after the 2008 trial, 28 U.S.C. § 1291; see also Baetjer v. Garzot Fernandez, 329 F.2d 798, 799 (1st Cir. 1964) (per curiam), we discuss Callahan's claim that there never should have been a 2009 retrial, as well as his claims relating to the 2009 retrial.

## II.

We first address the three issues that Callahan claims would entitle him to judgment as a matter of law.  After rejecting

---

[5] The jury was also asked whether Drumgold had proven that Callahan intentionally or recklessly obtained false statements or manufactured evidence.  The jury answered "no" to that question.

-14-

Callahan's arguments on these issues, we proceed to his alternative assertion that he is entitled to a new trial because the causation instruction given to the retrial jury was erroneous. Since we agree with Callahan on that claim, we do not consider his other arguments for a new trial or further proceedings.[6]

## A. The Materiality of the Withheld Evidence

Callahan argues that none of the evidence he was found to have withheld during Drumgold's criminal trial is material within the meaning of Brady. We provide an overview of Brady before turning to the merits of this issue.

### 1. Brady

Brady was an "extension" of a line of cases beginning with Mooney v. Holohan, 294 U.S. 103 (1935), and Pyle v. Kansas, 317 U.S. 213 (1942), in which the Supreme Court held that a state actor violates a criminal defendant's due process rights by the knowing use of perjured testimony or the deliberate suppression of evidence leading to the defendant's conviction. 373 U.S. at 86; see also Kyles v. Whitely, 514 U.S. 419, 432 (1995) (noting that Brady "can trace its origins to early 20th-century strictures against misrepresentation"). The duty that these cases established

---

[6] Callahan's other arguments are that the judge erred in excluding from the 2009 retrial a package of forty-five investigative reports, instructing the retrial jury on the extent of damages for which he could be held liable, failing to remit a portion of the damages award, and awarding excessive attorneys' fees.

has always applied equally to prosecutors and law enforcement officers. See Haley v. City of Boston, 657 F.3d 39, 50 (1st Cir. 2011); Limone v. Condon, 372 F.3d 39, 47 (1st Cir. 2004).

Brady broke new ground in holding that a prosecutor also violates a defendant's due process rights merely by failing to disclose material evidence in his possession that is favorable to the defendant, irrespective of the good or bad faith of the prosecutor. See 373 U.S. at 87. As a result, Brady is "sometimes referred to as imposing a no-fault disclosure obligation" on prosecutors. Haley, 657 F.3d at 48; see also Porter v. White, 483 F.3d 1294, 1305 (11th Cir. 2007) ("The Brady rule . . . imposes a no-fault standard of care on the prosecutor."). Subsequent to Brady, the Supreme Court clarified that this affirmative disclosure obligation also encompasses evidence known only to law enforcement officers and not to prosecutors. See Kyles, 514 U.S. at 437-38; see also Strickler v. Greene, 527 U.S. 263, 280-81 (1999); Haley, 657 F.3d at 49. Although "the responsibility for obtaining and disclosing . . . evidence remains the duty of the prosecutor," Haley, 657 F.3d at 49, law enforcement officers have a correlative duty to turn over to the prosecutor any material evidence that is favorable to a defendant, see Moldowan v. City of Warren, 578 F.3d 351, 381 (6th Cir. 2009); McMillian v. Johnson, 88 F.3d 1554, 1567 (11th Cir. 1996). Evidence is favorable to a defendant if it is either exculpatory or impeaching in nature. See United States v.

Bagley, 473 U.S. 667, 676 (1985). Evidence is material if there is a "reasonable probability" that, had it been disclosed, the result of the proceeding would have been different. Id. at 682.[7] "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." Kyles, 514 U.S. at 434. Thus, a reasonable probability exists when the withholding of evidence undermines confidence in the outcome of the trial. See id.; Bagley, 473 U.S. at 682.

We have been careful to distinguish between the proscription originating in Mooney and Pyle against the deliberate suppression of evidence and the more recent affirmative disclosure obligation announced in Brady. See Haley, 657 F.3d at 46. The allegations in this case primarily go to deliberate suppression. However, the record does not permit us to exclude the possibility that Callahan merely failed to disclose evidence with a less culpable state of mind, particularly in light of the retrial jury's

---

[7] "Significant possibility" might be a better term than "reasonable probability" because the latter term "raises an unjustifiable risk of misleading courts into treating it as akin to the more demanding standard, 'more likely than not.'" Strickler, 527 U.S. at 298 (Souter, J., concurring in part and dissenting in part). Nevertheless, "reasonable probability" remains the proper formulation.

finding that he acted "intentionally or recklessly."[8]  We therefore construe Drumgold's invocation of Brady as shorthand for his full complement of due process rights, including both those articulated in Mooney and Pyle and those first described in Brady itself.  See Strickler, 527 U.S. at 281-82 (explaining that "a true Brady violation" involves evidence that was "suppressed by the State, either willfully or inadvertently").

### 2.  Analysis

With this framework in mind, we focus on the merits of the materiality issue, beginning with the 2008 civil trial and then moving to the 2009 retrial.  There are serious questions as to whether Callahan properly preserved this issue for our review in either proceeding.  If the issue was preserved, our review is de novo.  See Zachar v. Lee, 363 F.3d 70, 73 (1st Cir. 2004).  If not, our review is for plain error.  See Simon v. Navon, 71 F.3d 9, 13 (1st Cir. 1995).  However, since Callahan's challenge fails even if we apply the standard of review most favorable to him, we will assume the issue is preserved and review de novo whether he is entitled to judgment as a matter of law.  See Zachar, 363 F.3d at 73.  "In undertaking this review, we look to all evidence in the

---

[8] The district judge at one point instructed the retrial jury that it could hold Callahan liable only if it found that he "knowingly and deliberately" withheld evidence, but she also repeatedly explained that Drumgold had to prove that Callahan acted "intentionally or recklessly," and the special verdict form used in the retrial reflected that formulation.

-18-

record, drawing all reasonable inferences therefrom in [Drumgold's] favor, and resist the temptation to weigh the evidence or make our own credibility determinations."  Id.  We may rule in Callahan's favor only if no reasonable person could view the withheld evidence as material.  See id.; Correa v. Hosp. San Francisco, 69 F.3d 1184, 1191 (1st Cir. 1995).

### a.  The 2008 Trial

To recap, the jury in the 2008 trial found that Callahan withheld evidence that he provided Evans with "substantial amounts of money."  The question is whether a reasonable jury could view that evidence as material.

Evans was one of the prosecution's star witnesses during Drumgold's criminal trial.  As described above, he testified that, shortly before Moore was killed, he saw Drumgold and Taylor carrying guns near the murder scene.  He also testified that Taylor told Drumgold at that time that he knew where they could find Chris Chaney and Mervin Reese, whom Beauchesne identified in his opening statement as the intended targets of Moore's shooting.  Finally, Evans testified that when he next encountered the pair, about an hour after the shooting, Drumgold appeared anxious and Evans heard Taylor say that their guns were "hot" and had been "stashed" in a safe location.

To be sure, other witnesses also linked Drumgold to Moore's death.  Chris Cousins testified that he visited the wounded

Romero Holliday in the hospital shortly before Moore was killed. There, Cousins heard Holliday tell Drumgold and Taylor that Chaney and Reese had shot him, prompting Drumgold and Taylor to assure Holliday that they were "going to get who did it" in retaliation. Another witness, Vantrell McPherson, testified that she saw Drumgold and Taylor two streets away from where Moore was shot approximately three hours before the shooting, and that Taylor had said to Drumgold, "[c]ome on, Shawn, you know we got to go do this," although McPherson had not known what the two men were talking about.

Two witnesses claimed to have seen Drumgold near the scene of Moore's shooting shortly after it occurred. Mary Alexander, who lived a few blocks away, testified that she heard a gunshot and then saw a man whom she identified in court as Drumgold climb over a fence behind her house with a gun tucked into his waistband. Tracy Peaks, a neighbor of Alexander's, testified that a man she recognized as Drumgold walked casually by her home just after Moore was killed. A third witness, Eric Johnson -- who had been leaning on the mailbox where Moore was perched and who "kn[e]w [Drumgold] from the neighborhood" -- testified that he suspected one of the masked shooters was Drumgold, largely because one shooter appeared "bowlegged," as Johnson believed Drumgold to be.

However, the testimony of many of these witnesses was called into serious doubt. On cross-examination, Drumgold's

-20-

attorney elicited from Alexander the admissions that she had not initially been able to pick out Drumgold from a photo array after the shooting and that, before identifying him in court, she had seen Drumgold's picture in a Boston newspaper alongside an article describing him as Moore's killer. In addition, Alexander said that Drumgold appeared to be significantly shorter than the man whom she saw climb a fence behind her house. Drumgold's attorney also got Johnson to concede that he was not certain the bowlegged shooter was Drumgold: "I'm not going to say it was Shawn. . . . I say he looked similar to Shawn. I can't come out and say straight it was Shawn. I don't know." Romero Holliday testified that Chris Cousins never visited him in the hospital, where Cousins claimed to have overheard Drumgold and Taylor promise to "get" whomever had shot Holliday. In fact, Holliday claimed that he did not even know Drumgold at the time of Moore's murder.

Evans's testimony, too, was impeached. There was evidence at trial of his past criminal activity and other bad acts, as well as evidence that police officers investigating Moore's death assisted him with outstanding warrants. Taylor's counsel also questioned why Evans did not come forward with information until ten months after the shooting. The existence of this other impeachment evidence is relevant to the claim here insofar as it offered a reason to disbelieve Evans even without the withheld evidence. See United States v. Brandao, 539 F.3d 44, 64 (1st Cir.

-21-

2008); <u>Mastracchio</u> v. <u>Vose</u>, 274 F.3d 590, 603 (1st Cir. 2001). Still, its impact at trial was countered by Evans's insistence that his motivation for testifying was sympathy for Moore's mother: "I just felt like she lost her daughter so why not go and tell the truth when you can. . . . I got a daughter myself and I wouldn't want her to be sitting on the mailbox and get shot." Evidence that Callahan gave Evans "substantial amounts of money" for assisting with the investigation and prosecution of Drumgold could have put the lie to that claim.

The record is mixed as to when Evans received the money in question. By all accounts, it was while he was living at the Howard Johnson hotel. Evans was unable to recall the exact date that he moved into the hotel, except that it was on "a summer night" in 1989. He also could not recollect when he left the hotel, although it was some time after Drumgold's criminal trial concluded. In all, Evans estimated that he lived at the hotel for eight months. According to Callahan, however, Evans arrived at the hotel only a few weeks before the criminal trial -- on September 12, 1989. This chronology is important because, as Callahan points out, Evans's criminal trial testimony was consistent with pretrial statements he made as early as June 21, 1989. If these statements preceded Evans's receipt of money from Callahan, disclosure of that benefit might have made a smaller splash at the criminal trial. <u>See</u> <u>Mastracchio</u>, 274 F.3d at 603-04.

-22-

Although it is hardly conclusive, there was sufficient evidence in the 2008 trial -- drawing all reasonable inferences from the record in Drumgold's favor, see Zachar, 363 F.3d at 73 -- that Evans was already living in the Howard Johnson hotel at the time of his pretrial statements. Drumgold's criminal trial ended on October 13, 1989. Given Evans's testimony that he departed the hotel some time afterward, and his estimation that he boarded at the hotel for eight months in total, he could have arrived there before June 21, 1989, and so he could have been receiving cash assistance from Callahan before he gave pretrial statements to him. This timeline is compatible with Evans's memory of moving into the hotel on "a summer night."[9]

As a result, there is a reasonable probability that, if Callahan's provision of "substantial amounts of money" to Evans had been disclosed during the 1989 criminal trial, the result of that proceeding would have been different. This is not to say that Evans's criminal trial testimony was, on its own, sufficient to support Drumgold's conviction. After all, his testimony was equally inculpatory of Taylor, against whom the state court dismissed all charges. Nevertheless, Evans's testimony was crucial in connecting the accounts of other prosecution witnesses against Drumgold, and evidence that he received a significant financial

_____

[9] Although the official first day of summer usually falls on June 21, we understand Evans to mean that he moved into the hotel on a warm, summer-like evening.

benefit from Callahan might well have affected the jury's perception of his credibility.

### b. The 2009 Retrial

The foregoing analysis applies equally to the retrial jury's determination that Callahan withheld evidence that he provided Evans with free lodging. We have no doubt that a reasonable jury could view the lodging evidence as material, the same as evidence that Callahan gave Evans "substantial amounts of money." Those benefits were a "big deal" to Evans and transformed his quality of life. There is a reasonable probability that disclosure of the lodging benefits would have changed the outcome of Drumgold's criminal trial.

Disclosure of evidence that Callahan gave Evans $20 to purchase food on one occasion would not have had the same effect, however. That sum is too small to have made a difference in the particular circumstances of this case. Indeed, the lawyer who represented Drumgold during his criminal trial conceded in the 2009 retrial that he would not have cross-examined Evans about a gift of $20. As a result, no reasonable jury could regard this evidence as material.

## B. Qualified Immunity

Callahan argues that, even if the evidence he withheld was material, he is entitled to judgment as a matter of law on the basis of qualified immunity because it was not clearly established

at the time of Drumgold's criminal trial that he had any affirmative disclosure obligation under Brady. Again, there are serious questions about whether Callahan preserved this issue for our review. However, because Callahan's argument fails in any event, we will once more assume the issue is preserved and apply a de novo standard of review. See Walden v. City of Providence, 596 F.3d 38, 52 (1st Cir. 2010); Guillemard-Ginorio v. Contreras-Gómez, 585 F.3d 508, 525-26 (1st Cir. 2009). Throughout, we discuss the 2008 trial and the 2009 retrial together.

### 1. The Qualified Immunity Doctrine

"Qualified immunity is a judge-made doctrine designed to 'balance two important interests -- the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" Haley, 657 F.3d at 47 (quoting Pearson v. Callahan, 555 U.S. 223, 231 (2009) (internal brackets omitted)). The doctrine thus protects from liability for civil damages all public officials other than those who, "from an objective standpoint, should have known that their conduct was unlawful." Id. (internal quotation marks omitted); see also Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

The qualified immunity inquiry has two parts. See Pearson, 555 U.S. at 232; Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009). A court must decide whether the plaintiff has

made out a violation of a constitutional right and, if so, whether the right was clearly established at the time of the violation. See Maldonado, 568 F.3d at 269. This second part, in turn, has two aspects. See id. The first focuses on the clarity of the law at the time of the violation. See id. The other aspect focuses more concretely on the facts of the particular case and whether a reasonable defendant would have understood that his conduct violated the plaintiff's constitutional rights. See id. The "salient question" is whether the state of the law at the time of the violation gave the defendant fair warning that his particular conduct was unconstitutional. Id. (citing Hope v. Pelzer, 536 U.S. 730, 741 (2002)).

## 2. Application

We have already rejected Callahan's argument that the exculpatory evidence he withheld is not material within the meaning of Brady. It follows that Drumgold has made out a violation of his constitutional due process rights. See Brady, 373 U.S. at 87. The question we now confront is whether those rights were clearly established at the time of the 1989 criminal trial.

The essence of Callahan's argument is that the affirmative disclosure obligation Brady imposed on prosecutors in 1963 was not expanded to include law enforcement officers until Kyles was decided in 1995. That is true, so far as it goes. See Haley, 657 F.3d at 48-49. As we have said, though, this case also

involves the deliberate suppression aspect of Brady. There can be no doubt that, under the line of cases running from Mooney and Pyle to Brady, the law was firmly settled at the time of Drumgold's criminal trial that a law enforcement officer may not deliberately suppress material evidence that is favorable to a defendant. See id. at 49-51; Limone, 372 F.3d at 45; Newsome v. McCabe, 256 F.3d 747, 752-53 (7th Cir. 2001); McMillian v. Johnson, 88 F.3d 1554, 1568-69 (11th Cir. 1996).

Moreover, to the extent that Callahan acted deliberately, a reasonable officer in his position plainly would have appreciated the wrongfulness of his conduct. Callahan claims that a reasonable officer would not have recognized the evidence in question as material because Drumgold's lawyer had not bothered to cross-examine another prosecution witness, Travis Johnson, on the fact that the district attorney's office paid for his accommodations during the criminal trial. However, Johnson had to travel to Boston from another state to testify, and the benefits he received were tailored to facilitate his appearance at the trial. By contrast, viewed in the light most favorable to Drumgold, see Walden, 596 F.3d at 52, the benefits Evans received had little to do with ensuring his availability to testify or, for that matter, his safety as a cooperating witness. Evans was permitted to remain in the Howard Johnson hotel for eight months, he was free to come and go as he pleased, and no one monitored his whereabouts. A

reasonable officer would have discerned the difference between the open-ended benefits Evans received and the far more limited benefits Johnson received.  As a result, there is no basis for awarding Callahan judgment as a matter of law on qualified immunity grounds.[10]

The dissent's lengthy discussion attempting to show that Callahan is entitled to qualified immunity is flawed both factually and legally.  As a threshold matter, the dissent argues that Drumgold never raised a claim related to the hotel evidence under "the <u>Mooney</u> line of cases" and contends that it is unfair to allow the belated introduction of such a claim on appeal.  Although Drumgold did not cite <u>Mooney</u> and <u>Pyle</u> by name, the due process claim those cases support -- that Callahan deliberately withheld

_____

[10] We do not mean to suggest that a law enforcement officer can be liable today in a damages action under 42 U.S.C. § 1983 only for deliberately suppressing evidence.  Non-disclosure with a less culpable state of mind might suffice.  See <u>Haley</u>, 657 F.3d at 47 (assuming without deciding that "no-fault nondisclosure constitutes a viable claim of breach").  This is a difficult question that has engendered a range of views.  <u>See</u>, <u>e.g.</u>, <u>Tennison</u> v. <u>City and Cnty. of San Francisco</u>, 570 F.3d 1079, 1089 (9th Cir. 2009) ("[A] § 1983 plaintiff must show that police officers acted with deliberate indifference to or reckless disregard for an accused's rights or for the truth in withholding evidence from prosecutors."); <u>Porter</u>, 483 F.3d at 1306 ("[T]he no-fault standard of care <u>Brady</u> imposes . . . in the criminal or habeas context has no place in a § 1983 damages action against a law enforcement official in which the plaintiff alleges a violation of due process."); <u>Villasana</u> v. <u>Wilhoit</u>, 368 F.3d 976, 980 (8th Cir. 2004) ("[T]he recovery of § 1983 damages requires proof that a law enforcement officer . . . intended to deprive the defendant of a fair trial.").  We do not reach this question here.  Our holding is limited to the law as it was clearly established in 1989, when Callahan engaged in the conduct at issue here.

material impeachment evidence -- was a central part of the case as tried. Indeed, in objecting to the district court's proposed jury instructions for the 2009 trial, Callahan argued that "the jury should be explicitly informed that it is the intentional suppression -- that is, the intentional withholding of evidence -- that is the core allegation at issue." He made similar assertions in his Memorandum of Law in Support of His Requested Jury Instructions, where he stated, inter alia, that "[t]he jury should . . . be instructed that the burden remains on Drumgold at all times to prove intentional and deliberate suppression of evidence . . . ." The suppressed evidence at issue was the provision of hotel and cash benefits to Evans, conduct distinct from Drumgold's allegation that Callahan had framed him by manufacturing evidence and inducing Evans to testify falsely.

What matters is not the nomenclature of Drumgold's withholding-of-evidence claim -- whether we characterize it as "Brady-based" or "Mooney-based" -- but what the parties, the court, and the jury understood about the nature of the claim. The instructions offered by Callahan and given by the court both required a finding of intentional or reckless conduct,[11] and the jury verdict form was likewise framed that way. Hence, there is no

---

[11] Indeed, the court instructed the jury that "[w]ithholding material exculpatory evidence by accident or mistake does not give rise to liability under the Federal Civil Rights Act. As I said, the conduct must be either intentional or reckless."

-29-

lack of notice problem or any other unfairness associated with Drumgold's deliberate suppression claim.

Moreover, the omission of citations to Pyle and Mooney in Drumgold's briefing of his Brady claim on appeal does not mean that he has discarded the claim that Callahan deliberately suppressed evidence. As we have explained, Drumgold's invocation of Brady can only reasonably be understood to broadly state the scope of his constitutional claim against Callahan, not to limit it to the less egregious failure to disclose. It turns the Brady principle on its head to say that a constitutional due process claim exists under Brady if a police officer allegedly failed to fulfill an affirmative obligation to disclose evidence irrespective of fault, but not if the officer is alleged to have deliberately suppressed that same evidence. In arguing that Drumgold's "Brady" claim covers only the affirmative obligation to disclose evidence -- an obligation that was not clearly established for police officers at the time of Callahan's alleged actions -- the dissent slices away the foundational assumption of Brady that deliberate suppression of material evidence is a constitutional violation. See Strickler, 527 U.S. at 282 (stating that "a true Brady violation" includes instances where evidence was willfully suppressed by the state).

The dissent's confinement of Brady to no-fault nondisclosure claims, while describing a Mooney claim as one of "intentional framing," implausibly leaves claims asserting a

-30-

<u>deliberate</u> withholding of evidence without a category of constitutional redress. To the extent the dissent's labeling is only case specific -- that is, the invocation of <u>Brady</u> <u>in this case</u> referred only to the affirmative failure to disclose, not the deliberate suppression of evidence -- the dissent, as noted, is flatly wrong.

Here, the jury rejected Drumgold's "non-<u>Brady</u>" claim that Callahan intentionally framed him by obtaining false statements from Evans or otherwise manufacturing evidence. But it found that the exculpatory hotel evidence was "intentionally or recklessly withheld" -- conduct that, if deliberate, was clearly unlawful at the time Callahan acted. The labeling of this failure-to-disclose claim as a <u>Brady</u> claim, or something else, makes no difference where, as a matter of substance, the claim plainly was understood by the parties, the judge, and the jury to embrace a culpable state of mind.

The dissent also argues that Callahan would be entitled to qualified immunity even if the deliberate suppression of evidence is covered by Drumgold's <u>Brady</u> claim. This assertion, however, improperly relies on unsupported factual inferences from the jury's verdict. The dissent states that the jury's findings do not establish specific intent. We agree -- but that non-finding

-31-

does not earn Callahan immunity even assuming that specific intent were the only state of mind sufficient to support liability.[12]

The special verdict form in the 2009 trial asked whether Callahan "intentionally or recklessly withheld exculpatory evidence," and the jury answered "yes" without specifying the state of mind it found. The dissent points out that the jury "made no express finding that Callahan acted with the purpose of suppressing such evidence." Yet the jury also made no express finding that he did not.

Qualified immunity is an affirmative defense. We see no justification for granting immunity based on the supposition that the jury found the lesser state of mind, particularly when -- in Callahan's words -- "intentional withholding of evidence . . . [was] the core allegation at issue." The dissent points to

---

[12] In his Memorandum of Law in Support of His Request for Jury Instructions, Callahan stated:

> The jury should be instructed that in order to find against Callahan, they must find that his omission of material exculpatory evidence must have been essentially deliberate. Omission of material exculpatory evidence by accident or mistake or through some ordinary level of negligence or carelessness does not give rise to liability under the statute; rather, the omission must have been either intentional or reckless, which the law treats as equivalent of intentional.

Memorandum at 8 (emphasis added); see also, e.g., Tennison, 570 F.3d at 1088 (stating that a § 1983 plaintiff alleging a due process claim against a police officer for withholding evidence must show "deliberate indifference to or reckless disregard for an accused's rights or for the truth in withholding evidence from prosecutors" (emphasis added)).

testimony that Callahan had told a prosecutor not involved in Drumgold's case about placing Evans in a hotel and suggests that, as a result, the jury could not have found intentional suppression. It is the jury's province, however, to weigh such evidence along with the other evidence presented at trial concerning Callahan's state of mind. Because another trial is necessary, as we explain <u>infra</u>, the jury will again have the opportunity to do so.

## C. The Scope of the 2009 Retrial

As noted above, the retrial jury found that Callahan withheld evidence that he provided Evans with free housing and $20. We have already explained that evidence of the latter benefit is not material. Hence, Callahan cannot be liable for withholding that evidence. Callahan now contends that the retrial jury should not have been permitted to reexamine the question of whether he withheld the housing evidence, since that question was resolved in his favor during the 2008 trial. He claims that there is, thus, no valid basis for his liability and that he is entitled to judgment as a matter of law. There is no dispute that this issue was preserved.

Although much of the relevant background has already been laid out elsewhere in this opinion, we repeat portions of it here for clarity's sake. In the 2008 trial, the jury determined that Callahan had not withheld evidence that he arranged free housing for Evans, but had withheld evidence that he gave Evans

"substantial amounts of money."  The jury then hung on the question of whether Callahan's misconduct had caused Drumgold's conviction. After a mistrial was declared, Callahan moved for the entry of a final judgment as to, inter alia, the housing issue and simultaneously sought to restrict the scope of a retrial to the causation question on which the first jury deadlocked.

The district judge initially appeared receptive to this idea but ultimately rejected it.  She reasoned that a retrial limited to causation was not feasible:

> A second jury would obviously have to be instructed that Callahan had violated Drumgold's civil rights by giving him "substantial amounts of money" and not disclosing it.  The jury would be left with the ambiguity of what "substantial money" meant -- an issue wholly unresolved in the first trial, notwithstanding the Court's efforts to seek further clarification.  And the only way to resolve that ambiguity would be to relate each side's evidence concerning the treatment of Ricky Evans -- why Ricky Evans's testimony was significant to the Drumgold prosecution, that there had been no eyewitnesses to the murder that Drumgold was convicted of, . . . the relationship between defendant Callahan and the witness, the steps that defendant Callahan allegedly took to secure Evans's testimony (hotel rooms, meals, cash, etc.).  In short, all aspects of Ricky Evans's portion of this case would be involved.

As a result, the judge declined to enter a final judgment as to the housing issue and permitted the retrial jury to determine afresh what housing and money benefits, if any, Callahan gave Evans and failed to disclose.

The general practice after a mistrial is a full retrial of all issues in the case. See Nissho-Iwai Co. v. Occidental Crude Sales, 729 F.2d 1530, 1538 (5th Cir. 1984). However, when some issues have been properly and conclusively resolved, there may be a partial retrial on the remaining issues if it "clearly appears" that they are "so distinct and separable from the others that a trial of [them] alone may be had without injustice." Gasoline Prods. Co. v. Champlin Refining Co., 283 U.S. 494, 500 (1931). This determination is distinctly within the ken of the trial judge. See Sprague v. Boston & Me. Corp., 769 F.2d 26, 28 (1st Cir. 1985). Accordingly, our review of the judge's decision as to the scope of the 2009 retrial is for abuse of discretion. See Winn v. Lafayette Town House, 839 F.2d 835, 837 (1st Cir. 1988); Sprague, 769 F.2d at 28.

There were three possible ways to define the scope of the retrial. First, the judge could have confined the retrial to the causation inquiry that stymied the first jury. We agree with the judge that this was not a feasible option. The retrial jury could not have conducted a meaningful causation inquiry without rehearing the entirety of the 2008 trial evidence involving Evans in order to understand both the dynamics of his relationship with Callahan and his role in Drumgold's criminal trial. Having heard that evidence, the retrial jury inevitably would have drawn its own conclusions as to the nature and amount of benefits that Callahan gave Evans, and

would have been confused if prevented from returning a verdict reflecting those conclusions. While juries are frequently instructed to consider evidence for one purpose and not others, see Fed. R. Evid. 105, we share the district judge's concern that such an instruction would have posed an unacceptably high risk of confusion in this case, see Colonial Leasing of New England, Inc. v. Logistics Control Int'l, 770 F.2d 479, 481 (5th Cir. 1985) ("[W]hen the issues subject to retrial are so interwoven with other issues in the case that they 'cannot be submitted to the jury independently . . . without confusion and uncertainty, which would amount to a denial of a fair trial,' then it is proper to grant a new trial on all of the issues raised." (quoting Gasoline Prods., 283 U.S. at 500)); Sears v. S. Pac. Co., 313 F.2d 498, 503 (9th Cir. 1963).

The second route the judge could have taken was to allow the retrial jury to revisit whether Callahan withheld evidence that he gave money to Evans but not whether Callahan withheld evidence regarding the housing benefit. This approach, too, would have risked confusion since the evidence concerning the various benefits at issue here overlaps both topically and temporally. Moreover, it would have been unfair to Drumgold if he had to prove anew in the retrial that Callahan withheld evidence of a financial benefit to Evans, but Callahan was able to capitalize on the first jury's finding that he did not withhold evidence of a housing benefit.

The third option, which the judge embraced, was a compromise solution. Permitting the retrial jury to reopen the housing issue clearly disadvantaged Callahan. However, reopening the financial benefit issue worked to Callahan's advantage since it canceled out the first jury's finding that he withheld evidence that he gave Evans "substantial amounts of money." That opened the door for Callahan to persuade the retrial jury that the amount of money in question was only $20 -- a sum we have now said was too low to support his liability.

We find no abuse of discretion in the judge's ruling. The causation inquiry unresolved in the 2008 trial was not "so distinct and separable" from the housing issue that a partial retrial limited to causation plainly could be had without injustice. Gasoline Prods., 283 U.S. at 500. The judge's solution to that problem was sensible and evenhanded.

The dissent's contrary view fails to give deference to the district court's carefully considered compromise and, hence, cannot be reconciled with the abuse of discretion standard. This is a difficult case, factually and legally. The 2008 trial spanned twenty-five days. The district court judge was deeply engaged with the issues over a lengthy period of time. Our colleague nonetheless challenges the district court's judgment with a scattershot effort to depict its ruling as both legally and factually erroneous. The dissent's analysis, however, reduces to

a disagreement with the district court on a question that is uniquely within the district court's expertise: whether this is a case where "the issues were too 'interwoven' to retry one issue separately."

As we have explained, the district court had multiple paths to choose from. Its conclusion that the facts surrounding the provision of "substantial amounts of money" to Evans inevitably would implicate the entirety of Callahan's relationship with Evans is supportable and, in the context of this case, does not require the extensive elaboration required by our colleague. The district court's explanation was wholly adequate. Nor does the district court's ruling conflict with Gasoline Products, where the Supreme Court considered the propriety of a court's departure from the common law rule that an error with respect to one issue results in a new trial on all issues. See 283 U.S. at 497. The Supreme Court's conclusion that the Seventh Amendment "does not compel a new trial of [all issues] even though another and separable issue must be tried again," id. at 499, does not tilt the constitutional balance in favor of a limited retrial. In sum, we have no reason here -- and no license -- to preempt the district court's choice on the contours of the new trial.

Hence, there was a valid basis for Callahan's liability in the 2009 retrial.

**D. The Jury Instructions**

We have now established that Callahan is not entitled to judgment as a matter of law. We turn to his alternative argument that a new trial is necessary because the judge's instructions on causation to the retrial jury were erroneous. We begin our discussion with the applicable legal framework and then quote the pertinent parts of the jury instructions before setting out the standard of review and moving to the merits of the issue.

**1. The Legal Framework**

Drumgold's claims against Callahan were brought under 42 U.S.C. § 1983, the federal civil rights statute. To recover damages under § 1983, Drumgold must show more than a <u>Brady</u> violation. <u>See</u> <u>Johnson</u> v. <u>Mahoney</u>, 424 F.3d 83, 89 (1st Cir. 2005); <u>see also</u> <u>Rodriguez</u> v. <u>Woodall</u>, 189 F. App'x 522, 527 (7th Cir. 2006) ("[A] constitutional violation, such as a <u>Brady</u> violation, is necessary, but more is needed."). He also must demonstrate by a preponderance of the evidence a causal link between the <u>Brady</u> violation and his conviction. <u>See</u> <u>Johnson</u>, 424 F.3d at 89.

As a general rule, "[w]e employ common law tort principles when conducting inquiries into causation under § 1983." <u>Sanchez</u> v. <u>Pereira-Castillo</u>, 590 F.3d 31, 50 (1st Cir. 2009) (internal quotation marks omitted); <u>see also</u> <u>Rodríguez-Cirilo</u> v. <u>García</u>, 115 F.3d 50, 52 (1st Cir. 1997) ("The issue of causation of

-39-

damages in a section 1983 suit is based on basic notions of tort causation."); Maldonado Santiago v. Velázquez García, 821 F.2d 822, 831 (1st Cir. 1987) ("Section 1983 imposes a causation requirement similar to that of ordinary tort law."). There are exceptions to this rule, though, and "[c]are must be taken in applying these principles to the § 1983 context." Olsen v. Correiro, 189 F.3d 52, 66 n.16 (1st Cir. 1999); see also Coscia v. Town of Pembroke, Mass., 659 F.3d 37, 40 (1st Cir. 2011); 1 Sheldon H. Nahmod, Civil Rights and Civil Liberties Litigation: The Law of Section 1983 § 3:106 (4th ed. 2011) ("[T]ort law purposes and interests are often different from § 1983 purposes and interests, and thus tort law concepts should not be blindly applied.").

Under tort causation principles, an actor may be held liable for harm to another person if the actor's misconduct was a factual cause of the harm, see Restatement (Third) of Torts § 26 (2010), and the harm resulted from the risks that made the conduct wrongful in the first place, meaning that it was a reasonably foreseeable consequence of the misconduct, see id. § 29. In turn, misconduct is considered a factual cause of harm in two mutually exclusive situations. The first is where the harm would not have occurred but for the misconduct. See id. § 26. This rule is sometimes called the "but for" causation principle. See id. § 26 cmt. b. The second scenario is where the harm was brought about concurrently by the misconduct and an unrelated force, each of

which would have been sufficient by itself to trigger the harm. See id. § 27. In that circumstance, the actor's misconduct was not a necessary condition for the harm, since the harm would have occurred in its absence due to the concurrent force. See id. § 27 cmt. a. Nevertheless, the misconduct is regarded as a factual cause of the harm for policy reasons, since the actor should not escape liability merely because of the fortuitous operation of another force that also would have produced the harm on its own. See Dan B. Dobbs et al., The Law of Torts § 189 (2d ed. 2011) ("It would be a windfall [if the actor] were to escape liability for the harm merely because another [force] was also sufficient to cause the same harm."); W. Page Keeton et al., Prosser and Keeton on Torts § 41 (5th ed. 1984). We refer to this rule as the concurrent causation principle.

The materiality standard articulated in Brady and its progeny incorporates a version of the "but for" causation principle. Evidence that was withheld during a criminal trial is material only if there is a reasonable probability that its disclosure would have altered the trial's outcome. See Strickler, 527 U.S. at 280; Kyles, 514 U.S. at 434; Bagley, 473 U.S. at 682. Put another way, there must be a reasonable probability that the defendant would not have been convicted but for the wrongful withholding of exculpatory evidence. Hence, one cannot establish a Brady violation without showing to the requisite standard that

-41-

the withholding of evidence was a necessary condition for the conviction.  In the criminal context, this showing may result in a new trial or a judgment of acquittal.

To recover damages in a civil trial based on such a violation, however, a § 1983 plaintiff must demonstrate a stronger causal link than is inherent in <u>Brady</u>'s materiality standard. Having already shown a reasonable probability that he would not have been convicted but for the withholding of evidence, the plaintiff must then make the same showing by a preponderance of the evidence.  In other words, the factual causation inquiry essentially replicates the materiality inquiry with a heightened burden of proof.[13]

Understood in this light, there is no place in the factual causation inquiry for the concurrent causation principle. That principle is incompatible with <u>Brady</u>'s materiality standard. Whereas under the concurrent causation principle misconduct can be a factual cause of harm even if the harm would have happened anyway, <u>see</u> Restatement (Third) of Torts § 27 (2010), withheld

---

[13] There is some logical appeal to bypassing the materiality inquiry and simply requiring the plaintiff to prove from the outset by a preponderance of the evidence that he would not have been convicted but for the withholding of evidence.  Nevertheless, materiality and causation are in fact discrete inquiries and should be considered separately.  The threshold question in a § 1983 suit is whether there has been a violation of a federally secured right. <u>See</u> <u>Baker</u> v. <u>McCollan</u>, 443 U.S. 137, 140 (1979).  Materiality properly is a component of that question.  The causation inquiry begins only after a violation has been established.  <u>See</u> <u>Sanchez</u>, 590 F.3d at 41.

evidence is never material within the meaning of <u>Brady</u> if its disclosure would have made no difference, <u>see</u> <u>United States</u> v. <u>Wall</u>, 349 F.3d 18, 23 (1st Cir. 2003).

The second element of the traditional tort causation inquiry limits the scope of an actor's liability to harm that results from the risks that made his conduct wrongful. <u>See</u> Restatement (Third) of Torts § 29 (2010). When material exculpatory evidence is withheld, the obvious risk is a tainted conviction. That risk is the reason for the <u>Brady</u> doctrine. Hence, once a <u>Brady</u> violation is established, there is no need to ask again whether the harm (i.e., the conviction) was foreseeable. Once a <u>Brady</u> violation has been shown, the causation inquiry in a § 1983 damages suit is only a "but for" inquiry pursuant to the preponderance of the evidence standard.

## 2. The Jury Instructions

We now turn to the jury instructions given in the 2009 retrial. The judge first gave a materiality instruction that has not been challenged.[14] She then gave a lengthy causation

---

[14] The materiality instruction was as follows:

Exculpatory evidence is material when it is of a type that could undermine confidence in the outcome of a trial. It would include evidence that has the potential to alter a jury's assessment of the credibility of a significant government witness.

In determining what is material, the question is not whether a defendant would more likely than not receive a different verdict if the evidence had been disclosed.

instruction, informing the retrial jury that, if it found that Callahan withheld material exculpatory evidence, it had to decide whether his misconduct caused Drumgold's conviction:

> Now, I'll address the question of cause, legal cause standard. If you determine that Officer Callahan committed a constitutional violation either by obtaining false statements or suppressing exculpatory evidence, and, again, material exculpatory evidence, you then need to address the relationship between the constitutional violations that you found and Shawn Drumgold's conviction. That relationship is defined by the legal concept known as causation.

---

The question is whether without the evidence he would receive a fair trial, understood as a trial resulting in a verdict worthy of confidence.

And in considering whether a verdict worthy of confidence would result, you have to consider the setting. . . . In [the 1989 criminal trial], the burden of proof was beyond a reasonable doubt. The [prosecution] was required to convince a unanimous jury beyond a reasonable doubt to sustain a conviction against Mr. Drumgold. Thus, one way of understanding materiality is to consider whether the undisclosed evidence would have created a reasonable doubt of the defendant's guilt.

This instruction omitted the statement that Drumgold had to show a reasonable probability that he would not have been convicted but for Callahan's withholding of evidence. The instruction noted that "evidence is material when it is of a type that could undermine confidence in the outcome of a trial" and that "the question is not whether a defendant would more likely than not receive a different verdict if the evidence had been disclosed." Those are important glosses on Brady's materiality standard, but the centerpiece of the standard is a reasonable probability of a different result. See Kyles, 514 U.S. at 434. The absence of that formulation from the instruction detracted from the causal showing at the heart of the materiality inquiry. Nevertheless, there is no challenge to the materiality instruction on appeal, and this omission is not a factor in our decision.

-44-

Causation has two elements: Factual cause and proximate cause. An act is a factual cause of an injury if it appears from the evidence that it was a substantial factor in bringing about the injury.[15]  There may be

---

[15] As explained above, an actor is liable in tort for harm to another person if the actor's misconduct was a factual cause of the harm, see Restatement (Third) of Torts § 26 (2010), and the harm resulted from the risks that made the conduct wrongful in the first place, meaning that it was a reasonably foreseeable consequence of the misconduct, see id. § 29.  These elements traditionally have been referred to as "factual causation" and "proximate causation," but the terms for these two concepts sometimes have been confused, as have the concepts themselves.  See Rodríguez-Cirilo, 115 F.3d at 54 (Campbell, J., concurring) (noting confusion); Fedorczyk v. Caribbean Cruise Lines, Ltd., 82 F.3d 69, 73 (3d Cir. 1996) (same); Dan B. Dobbs et al., The Law of Torts § 185 (2d ed. 2011) ("Courts often lump these two distinct issues together under the rubric of 'proximate cause.'").  One particular source of confusion has been the "substantial factor" test used in many jurisdictions, under which an actor may be held liable for harm if his misconduct was a substantial factor in bringing about the harm and no rule of law relieves the actor from liability because of the manner in which the harm occurred.  See Restatement (Second) of Torts § 431 (1965).  Although this test was intended as the "routine standard" for factual causation, Restatement (Third) of Torts § 26 cmt. j (2010), it commonly has been misunderstood to address proximate causation, as well, see, e.g., Clement v. United States, 980 F.2d 48, 53 n.13 (1st Cir. 1992); Richard W. Wright, Causation in Tort Law, 73 Cal. L. Rev. 1735, 1782 (1985).

The modern trend, endorsed by the American Law Institute ("ALI"), is to retain the term "factual causation" but abandon the "substantial factor" test, see Restatement (Third) of Torts § 26 cmt. j (2010), and to replace the problematic term "proximate causation" with "scope of liability," see id. Ch. 6, Special Note on Proximate Cause (2010), and thereby refocus the second component of the causation inquiry on whether the harm in question was among "those harms that result from the risks that made the actor's conduct tortious," id. § 29.  In addition, although the ALI for many years employed the umbrella term "legal cause" to encompass both elements of the causation inquiry, see Restatement (Second) of Torts § 430 (1965), it recently retired that term in an effort to emphasize that the two elements are distinct, see Restatement (Third) of Torts Ch. 6, Special Note on Proximate Cause (2010).

This trend has been embraced by a number of courts, see, e.g., June v. Union Carbide Corp., 577 F.3d 1234, 1240 (10th Cir. 2009);

a number of factual causes of any particular injury; not everyone whose acts are factual causes of an injury is legally responsible. The law determines whether it is fair to hold someone responsible for an injury using the concept of proximate cause. An act is the proximate cause of an injury if the injury is a reasonably foreseeable consequence of the act.

This does not mean that the law recognizes only one legal cause of an injury or damage consisting of only one factor or thing or the conduct of one person, of only one person. On the contrary, many factors or things may operate at the same time either independently or together, to cause an injury. In that case, each may be a legal cause.

Let me give you an example of legal causation. Two fires are raging in the forest. One started when someone dropped a match on the ground. The two fires join together and burn down a barn. Dropping the match was a substantial factor in the harm of burning down the barn. The barn burning down was a reasonably probable result of dropping the match. In other words, the match legally caused the damage to the barn even if lightning itself would have burned it down.

Put in the context of this case, you should decide whether Officer Callahan's wrongful conduct was a substantial factor in bringing about Shawn Drumgold's conviction and whether it was reasonably foreseeable that a conviction would result from his conduct.

---

Thompson v. Kaczinski, 774 N.W.2d 829, 837 (Iowa 2009), and, properly understood, merely represents a shift in terminology, see Restatement (Third) of Torts § 29 cmt. j (2010). The contours of the causation inquiry are unchanged.

We use the new terminology proposed by the ALI throughout this opinion to help us explain the error in the district judge's causation instruction. It is premature to adopt the new terminology generally. The district judge used the traditional terminology.

Defendant Callahan's, Officer Callahan's, conduct need not be the only cause nor the latest or the nearest cause, it is sufficient if it concurs with some other cause acting at the same time which in combination with it contributed to Shawn Drumgold's conviction.

Again, concerning legal cause, I remind you that the plaintiff has the burden of proving that any constitutional violations you identify were the cause of the damages Plaintiff Drumgold has sustained. In other words, Mr. Drumgold must prove by a preponderance of the evidence that Officer Callahan's actions in . . . failing to disclose material exculpatory information were a substantial factor in causing Mr. Drumgold's conviction and that the conviction was a reasonably foreseeable result of Officer Callahan's actions. The evidence on which you're to evaluate cause is the trial transcript which is now before you of the 1989 criminal trial.

### 3. The Standard of Review

Callahan objects to this instruction because it included the concurrent causation principle. Our standard of review depends on whether Callahan preserved this objection. See Colón-Millín v. Sears Roebuck de P.R., Inc., 455 F.3d 30, 40 (1st Cir. 2006).

Federal Rule of Civil Procedure 51 provides a method for preserving objections to jury instructions. See Surprenant v. Rivas, 424 F.3d 5, 15 (1st Cir. 2005). The judge must apprise the parties of the proposed instructions, consider requested instructions, and note objections before charging the jury. See Fed. R. Civ. P. 51(b); Booker v. Mass. Dep't of Pub. Health, 612 F.3d 34, 40-41 (1st Cir. 2010); Surprenant, 424 F.3d at 15. "An

-47-

objection lodged at that time preserves the underlying issue for appeal." Surprenant, 424 F.3d at 15; see also Fed. R. Civ. P. 51(c)(2)(A). If, however, the judge fails to inform a party of "an instruction or action on a request" before the jury is charged, the party may object "promptly after learning that the instruction or request will be, or has been, given or refused." Fed. R. Civ. P. 51(c)(2)(B); see also Booker, 612 F.3d at 41. A party who objects to an instruction must "stat[e] distinctly the matter objected to and the grounds for the objection." Fed. R. Civ. P. 51(c)(1).

Drumgold argues that Callahan not only failed to preserve his objection to the concurrent causation principle but invited any instructional error by advocating the indiscriminate application of traditional tort causation principles. See P.R. Hosp. Supply, Inc. v. Boston Scientific Corp., 426 F.3d 503, 505 (1st Cir. 2005) ("In general, a party may not appeal from an error to which he contributed, either by failing to object or by affirmatively presenting to the court the wrong law." (internal quotation marks omitted)); 9C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2558 (3d ed. 2008) ("The so-called invited error rule . . . prescribes that a party may not complain on appeal of errors that he himself invited . . . . Thus, a party who requests a jury instruction cannot complain if the instruction, or one substantially like it, is given by the trial judge." (footnote omitted) (internal quotation marks omitted)).

We disagree. Before the retrial jury was charged, Callahan objected to the inclusion in the judge's instructions of the example of two fires combining to burn down a barn. This example is a classic illustration of the concurrent causation principle, see Restatement (Second) of Torts § 432 cmt. d, illus. 4 (1965), and Callahan's objection adequately alerted the judge to his concern that this principle was inapposite. Moreover, Callahan expressly requested a causation instruction in line with the "but for" causation principle:

> The jury should be instructed that they are to consider the Evans issues within the context of the entire [1989 criminal trial], and that they may only find for Drumgold if they find that the conviction would not have occurred but for the alleged suppression of the Evans evidence.

Viewed together with the objection to the illustration of the concurrent causation principle, this requested instruction signaled an attempt to confine the causation inquiry in the 2009 retrial to the "but for" causation principle. Accordingly, we treat Callahan's objection as preserved. "We review de novo preserved claims of legal error in jury instructions, but we review for abuse of discretion claimed errors in instructions' form or wording." Uphoff Figueroa v. Alejandro, 597 F.3d 423, 434 (1st Cir. 2010); see also Portugues-Santana v. Rekomdiv Int'l, 657 F.3d 56, 60 (1st Cir. 2011). In doing so, we "look to the challenged instructions in relation to the charge as a whole, asking whether the charge in

-49-

its entirety —— and in the context of the evidence —— presented the relevant issues to the jury fairly and adequately." <u>Sony BMG Music Entm't</u> v. <u>Tenenbaum</u>, 660 F.3d 487, 503 (1st Cir. 2011) (internal quotation marks omitted). Even if we detect an error, a new trial is required only if the error was prejudicial. <u>See</u> <u>id.</u>

### 4. Analysis

The instructions given to the retrial jury appropriately presented materiality and causation as separate, sequential inquiries.[16] However, the judge made a fundamental error in describing the substance of the causation inquiry. She explained the concept of factual causation by reference to the "substantial factor" test and then fleshed out that test with a graphic illustration of the concurrent causation principle. Specifically, she used the example of two fires combining to destroy a barn to underscore the point that the fire ignited by the match could be considered "a substantial factor in the harm of burning down the barn . . . even if lightning itself would have burned it down." Insofar as that example implied that Callahan's misconduct could be a factual cause of Drumgold's conviction even if Drumgold would

---

[16] The special verdict form used in the retrial likewise presented materiality and causation as separate questions, directing the jury to decide first whether "the evidence withheld by Defendant Callahan was material" and then, if so, whether Callahan's withholding of that evidence "was a legal cause of Mr. Drumgold's conviction."

have been found guilty anyway, it was irreconcilable with Brady's materiality standard and had no place in the causation inquiry.

The judge should have limited her discussion of factual causation to the "but for" causation principle. That is, she should have directed the jury to determine whether Drumgold had proven by a preponderance of the evidence that he would not have been convicted but for Callahan's wrongful withholding of exculpatory evidence. Instead, the judge improperly invited the jury to analyze factual causation through the lens of the concurrent causation principle.[17]

We have no confidence that the retrial jury's verdict was unaffected by the instructional error. Having linked the "substantial factor" test with the concurrent causation principle, the judge told the jury to "decide whether Officer Callahan's wrongful conduct was a substantial factor in bringing about Shawn Drumgold's conviction," and reiterated at the close of the causation instruction that Drumgold had to "prove by a preponderance of the evidence that Officer Callahan's actions in . . . failing to disclose material exculpatory information were a substantial factor in causing [his] conviction." This charge was nearly the last thing the jury heard before it began its

_____

[17] In fairness to the district judge, we note that the issue of causation in civil trials seeking damages for Brady violations has not been well-developed. In that legal environment, it would be easy to make a mistake.

deliberations, and it diluted the standard of liability by making it possible for the jury to find that Callahan's withholding of evidence was a factual cause of Drumgold's constitutional injury (i.e., his wrongful conviction) even if that evidence was not the "but for" cause of Drumgold's conviction -- the materiality standard required by Brady. That illogical possibility could only have prejudiced Callahan.

It is our duty "to remain vigilant in policing the boundaries separating tort law from constitutional law," Nix v. Franklin Cnty. Sch. Dist., 311 F.3d 1373, 1379 (11th Cir. 2002), and to apply in the § 1983 context only those tort causation principles that are compatible with the underlying constitutional right, see Calero-Colón v. Betancourt-Lebron, 68 F.3d 1, 4 (1st Cir. 1995) ("[T]he essential elements of actionable section 1983 claims derive first and foremost from the Constitution itself, not necessarily from the analogous common law tort."). The causation instruction given in this case clashed with Brady's materiality standard. A wrongful conviction based on the withholding of exculpatory evidence is not redressable under § 1983 without a showing, by a preponderance of the evidence, of "but for" causation. The erroneous instruction here permitted the jury to impose liability even in the absence of that causal nexus. Therefore, another retrial is necessary. See Allen v. Chance Mfg. Co., 873 F.2d 465, 469 (1st Cir. 1989) ("An erroneous jury

instruction necessitates a new trial . . . if the error could have affected the result of the jury's deliberations.").

### III.

We vacate the judgment in Drumgold's favor and remand this case to the district court for a new trial consistent with this opinion.  Each party is to bear its own costs.

So ordered.

**– Dissenting Opinion Follows --**

**LYNCH**, **Chief Judge**, concurring in part, dissenting in part, and dissenting in the judgment. I join two of the majority's holdings: (1) that evidence of Callahan's provision of $20 to Evans, as found by the 2009 jury, was not material exculpatory evidence, and (2) that the district court erred in its causation instruction and that this error prejudiced Callahan. I dissent from the qualified immunity and scope of retrial holdings. On both of those issues, Callahan was and is entitled to judgment as a matter of law, and the case should not be remanded.

I.

As to both issues on which I dissent, some background is provided.

On October 13, 1989, Shawn Drumgold was convicted in Massachusetts state court of the first degree murder of twelve-year-old Darlene Tiffany Moore. The Massachusetts Supreme Judicial Court (SJC) affirmed the conviction on direct appeal in 1996. See Commonwealth v. Drumgold, 668 N.E.2d 300 (Mass. 1996). In 2003, a Massachusetts state judge held an evidentiary hearing on Drumgold's motion for a new trial, based on Drumgold's allegations of a series of newly discovered defects in the original trial. See Drumgold v. Commonwealth, 937 N.E.2d 450, 454 (Mass. 2010). Following the hearing, the Commonwealth of Massachusetts filed a motion to vacate the conviction. Id. The Commonwealth denied that any of Drumgold's allegations, taken alone, would justify a new trial, but

-54-

it admitted that, taken together, all of the allegations indicated that "justice may not have been done." Id. at 454 n.11. With the defendant and the prosecutor in agreement that a new trial was warranted, the state judge granted a new trial. Id. at 456-57. She emphasized that her ruling did not mean that Drumgold was factually innocent and did not mean that police or prosecutorial misconduct had been established. See id. at 457.

The evidence before the state judge in 2003 included: (1) that a key eyewitness, Mary Alexander, had been suffering from terminal brain cancer at the time of her testimony, a condition which caused memory loss, id. at 454-55; (2) that another key eyewitness, Tracie Peaks, had recanted her 1989 testimony and now claimed that it had been coerced, id. at 455 n.12; (3) that a third identification witness had also recanted his 1989 testimony, id. at 456 n.15; and (4) that Ricky Evans had recanted his 1989 testimony and that there had been undisclosed promises made to Evans regarding pending criminal charges against him and regarding the provision of housing and meals to him, id. at 455-56.

Having considered all of these grounds cumulatively, the judge vacated Drumgold's conviction, finding that he had been denied his right to a fair trial. Id. at 457. The judge emphasized that "nothing in [her] ruling in any way should be construed as a specific finding or determination . . . as to any grounds advanced by [Drumgold] in his motion for a new trial." Id.

After the state court's decision, the Commonwealth filed a nolle prosequi, ending all criminal proceedings against Drumgold arising out of the 1989 murder. Id. at 452.

Drumgold then filed a lawsuit against the Commonwealth in state court under the Massachusetts Erroneous Convictions Law, Mass. Gen. Laws ch. 258D, which provides for compensation up to $500,000 for victims of wrongful convictions, id. § 5. On application for direct appellate review of the denial of the Commonwealth's motion for summary judgment in that case, the SJC ruled that Drumgold was an eligible claimant under the statute. Drumgold, 937 N.E.2d at 452; see Mass. Gen. Laws ch. 258D, § 1. As the SJC's decision made clear, the combination of the various grounds offered in the new trial motion, and particularly the allegations regarding Alexander, were very serious. See Drumgold, 937 N.E.2d at 457-58. The present appeal involves only a portion of the fourth ground described above. The state case settled after remand; there is no public record of the amount the Commonwealth paid in settlement.

Meanwhile, in 2004, Drumgold also filed a federal lawsuit that led to this appeal.[18] In the district court, Drumgold asserted claims under 42 U.S.C. § 1983 and Massachusetts General Laws ch. 12, § 11I, against the City of Boston and three police officers,

---

[18] Drumgold filed his suit under the Erroneous Convictions Law separately because that statute provides for exclusive jurisdiction in Massachusetts Superior Court. Mass. Gen. Laws ch. 258D, § 3.

including Callahan. At the first trial of Drumgold's claims, in 2008, the jury concluded that Callahan had not in fact withheld or manufactured evidence relating to Mary Alexander or Tracie Peaks. As to Ricky Evans, the 2008 jury found that Callahan had not solicited false statements from him regarding the night of the murder and had only withheld evidence relating to certain cash payments to Evans, the amount of which the jury did not determine. On the twenty-fifth day of trial, the jury hung on the question of whether those payments had been a legal cause of Drumgold's injury.[19]

Nonetheless, the district court granted a retrial on all of Drumgold's claims relating to Ricky Evans. As a result of the second trial, in 2009, Drumgold obtained a $14 million verdict -- approximately a million dollars per year for each year he spent in prison, a rate we have described as "extremely generous" in wrongful conviction cases. Limone v. United States, 579 F.3d 79, 106 (1st Cir. 2009). Unlike the panoply of reasons the state court gave as the basis for vacating Drumgold's conviction, the basis for the 2009 damages award was solely that Callahan had withheld evidence of housing benefits and money benefits he had provided to

_____

[19] The jury rejected all theories of liability for the other police officer who remained as a defendant in the 2008 trial. The district court bifurcated Drumgold's claims against the City of Boston from his claims against the individual police officers. The portion of the case involving the City is stayed pending the outcome of this appeal.

Ricky Evans. See Drumgold v. Callahan, 806 F. Supp. 2d 405, 408 (D. Mass. 2011). That verdict was infected with error due to its jury instructions, as the majority holds. In addition, part of the 2009 jury's verdict directly contradicted part of the jury's decision in the first trial: the 2008 jury determined that Callahan had not withheld evidence about housing Evans in a hotel; the 2009 jury found that he had.

II.

A. Qualified Immunity

In my view, the law requires that Callahan be granted qualified immunity.[20]

In a qualified immunity inquiry, the court must ask (1) whether the plaintiff has made out a violation of a constitutional right, and (2) whether that right was "clearly established" at the

---

[20] Callahan has not waived his qualified immunity argument. He raised it at both the 2008 and 2009 trials, including a lengthy colloquy at the jury charge conference in 2008 regarding the applicable law. See Lynch v. City of Boston, 180 F.3d 1, 13 n.9 (1st Cir. 1999) ("[Federal Rule of Civil Procedure] 50(a)(2) is designed to prevent unfair surprise and to provide the responding party with an opportunity to correct any deficiencies in her proof. Our review of the record demonstrates that [plaintiff] could hardly have been surprised by [defendant]'s assertion of qualified immunity." (citation omitted)). Moreover, when Callahan again argued for qualified immunity in his renewed motion for judgment as a matter of law following the 2009 jury's verdict, Drumgold did not contend in his opposition to that motion that Callahan had waived the argument. Because Drumgold never argued waiver in the district court, the trial judge did not address the issue in her ruling on Callahan's post-trial motions. See Drumgold, 806 F. Supp. 2d at 417-19. If anything, then, it is Drumgold who has waived the argument that Callahan waived the qualified immunity defense.

-58-

time of the violation -- although the court need not necessarily address the questions in that order. See Maldonado v. Fontanes, 568 F.3d 263, 269-70 (1st Cir. 2009) (citing Pearson v. Callahan, 555 U.S. 223, 232, 236 (2009)). The "clearly established" prong, in turn, encompasses two questions: whether the right was, in general, "sufficiently clear that a reasonable official would understand that what he [was] doing violate[d] that right," id. at 269 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)) (internal quotation mark omitted); and whether, under the particular facts of the case, a reasonable defendant would have understood that he was violating the right, id.

As the majority recognizes, the $20 that Callahan gave to Evans, as found by the 2009 jury, was not material exculpatory evidence. Drumgold thus failed to make out a constitutional violation as to the money, and Callahan is entitled to qualified immunity on that issue under the first prong of the qualified immunity analysis. The only remaining issue, then, is whether Callahan was entitled to qualified immunity on the claim that he did not disclose to the prosecution in Drumgold's murder case that Ricky Evans was being housed in a hotel.

Callahan was clearly entitled to immunity, on several grounds.[21] The law was not clearly established in 1989 that

_____

[21] As I explain below in section II.B, Callahan was entitled to the benefit of the first jury's verdict on the hotel housing issue. The 2008 jury found that he did not withhold exculpatory

-59-

Callahan was under any duty to disclose such information, and a reasonable police officer in Callahan's position would not have understood that his alleged actions regarding Evans's housing violated a constitutional right.

This court has explained very recently that, at least until 1995, it was not clearly established that the affirmative disclosure obligation imposed on prosecutors by <u>Brady</u> v. <u>Maryland</u>, 373 U.S. 83 (1963), applied to police officers. <u>See</u> <u>Haley</u> v. <u>City of Boston</u>, 657 F.3d 39, 48-49 (1st Cir. 2011). "By its terms, <u>Brady</u> applied only to prosecutors." <u>Id.</u> at 48. Even after 1995, when the Supreme Court decided <u>Kyles</u> v. <u>Whitley</u>, 514 U.S. 419 (1995), the role of police officers in the <u>Brady</u> calculus remained "indirect," as that case held "that the disclosure obligation imposed by <u>Brady</u> extends to evidence known only to police officers, but that the responsibility for obtaining and disclosing such evidence remains the duty of the prosecutor." <u>Haley</u>, 657 F.3d at 49 (citing <u>Kyles</u>, 514 U.S. at 437-38).

It certainly was not clearly established in 1989 that a police officer in Callahan's position had an affirmative obligation under <u>Brady</u> to disclose potential impeachment evidence of the sort

---

evidence relating to Evans staying in a hotel and being provided with meals. Based on the 2008 jury's verdict, Callahan should have been granted qualified immunity on the hotel issue under the first prong of the qualified immunity inquiry. However, even if the 2009 jury's verdict on this point were permissible, Callahan should have been granted qualified immunity on that verdict under the second prong of the analysis, as I explain in this section.

at issue here.  Indeed, it is not clearly established today.  <u>See,</u>

<u>e.g.</u>, <u>Reid</u> v. <u>Simmons</u>, 163 F. Supp. 2d 81, 84 (D.N.H. 2001)

(describing "the circumstances under which police officers may be

held civilly liable for <u>Brady</u> violations" as "a matter of

considerable uncertainty"), <u>aff'd</u>, 47 Fed. App'x 5 (1st Cir. 2002)

(per curiam).  <u>Compare</u> <u>Jean</u> v. <u>Collins</u>, 221 F.3d 656, 660 (4th Cir.

2000) (en banc) (Wilkinson, J., concurring in the judgment) ("[T]o

speak of the duty binding police officers as a <u>Brady</u> duty is simply

incorrect.  The Supreme Court has always defined the <u>Brady</u> duty as

one that rests with the prosecution."), <u>with</u> <u>Newsome</u> v. <u>McCabe</u>, 256

F.3d 747, 752-53 (7th Cir. 2001) ("The <u>Brady</u> principle was

announced in 1963, and we [have] applied it . . . to affirm a hefty

award of damages against [police] officers who withheld exculpatory

information in 1981.").

Both of the parties and the trial judge conceived of the

housing and money issues as <u>Brady</u> issues throughout the district

court proceedings.[22]  For example, at the pretrial conference before

---

[22] This treatment was distinct from the parties' and the court's view of Drumgold's allegations that Callahan had manufactured evidence and convinced Evans to give false testimony. Although the framing of these latter allegations was inconsistent throughout the parties' various filings, they were frequently understood as involving due process rights other than those defined by Brady. The hotel and money issues, by contrast, were consistently treated as Brady issues. Callahan's arguments about the jury instructions on state of mind, cited by the majority, were premised on the assumption that Brady applied to police officers under Callahan's circumstances, an assumption later negated by Haley (a case decided in 2011, after both of Drumgold's trials were over).

the 2008 trial, the district court described one of the "principal constitutional rights" at issue in the case as "Brady violations." In both 2008 and 2009, Drumgold relied on Brady (and on Kyles -- a case that post-dated Callahan's alleged actions) in requesting jury instructions on a police officer's duty to disclose evidence to the prosecution. Before the 2008 trial, the district court issued a document titled "Proposed Brady Instruction." In the charge conference preceding the 2008 jury instructions, Callahan's counsel engaged in a lengthy discussion with the court regarding the lack of clarity about how to apply Brady to the situation in Drumgold's case. In Callahan's renewed motion for judgment as a matter of law following the 2009 trial, and in Drumgold's opposition to that motion, the parties argued for or against entering judgment for Callahan on the basis of whether a Brady violation had occurred. The district court echoed this understanding at the hearing on Callahan's motion, and a Brady theory was the basis of the court's denial of qualified immunity. See Drumgold, 806 F. Supp. 2d at 409, 417-19.

The district court's reason for denying immunity was error, as the majority admits. Because Callahan was not subject to a clearly established Brady duty in 1989, any alleged violation of Brady's dictates cannot be the basis for denying Callahan qualified immunity. The district court's reasoning cannot survive our decision in Haley. On this point, the majority and I agree.

However, the majority then attempts to rescue the district court's qualified immunity ruling by instead relying on a line of pre-Brady cases that neither the parties nor the trial judge ever used to support their arguments about the hotel evidence. In fact, these cases -- primarily Mooney v. Holohan, 294 U.S. 103, 112-13 (1935) (per curiam), and Pyle v. Kansas, 317 U.S. 213, 216 (1942) -- are not even cited in Drumgold's brief before this court.[23]

There are a number of problems with the majority's argument. First, the Mooney line of cases is an afterthought, not briefed by the parties nor explicated in the record. It is unfair to Callahan to deny immunity based on an argument that was not preserved and as to which he had no notice. See DeMayo v. Nugent, 517 F.3d 11, 15 (1st Cir. 2008) (stating that defendants who had used one Fourth Amendment theory to justify their actions before the district court could not "switch their theories on appeal" to a different Fourth Amendment reasoning); United States v. Slade, 980 F.2d 27, 31 (1st Cir. 1992) (rejecting argument that "only new facts and not new arguments about those facts are prohibited from debuting in the court of appeals" and concluding that "the

---

[23] In 2008, Drumgold did request two jury instructions based on these cases, but they both addressed the allegation that Callahan had manufactured Evans's testimony, not the allegation that he had withheld evidence of benefits. Mooney and Pyle are otherwise absent from Drumgold's pleadings both in the district court and in this appeal.

raise-or-waive rule applies with full force when an appellant tries to present a new theory about why facts previously placed on record are determinative"). This court may not create an argument for a party and may not deny immunity based on a different theory than that presented at trial. Such restraint is particularly important in the context of qualified immunity, which, after all, encompasses immunity from having to go to trial at all.

The majority's rejoinder that a mere citation to Brady without a citation to Mooney and Pyle suffices is off point.[24] Callahan lacked fair notice of the argument that the hotel evidence -- without more -- implicated a Mooney-based due process right. As explained above, all involved in the trial believed that the hotel evidence issue was governed by Brady. It is only the majority which has recharacterized the hotel claim as a non-Brady claim.

The majority appears to take the position that this distinction among various due process arguments means Brady does not govern. Not so. As we stated in Haley, it is necessary to distinguish Brady-based claims from Mooney-based claims when conducting a qualified immunity analysis. See 657 F.3d at 46. The two categories do not always cover the same types of claims, because they implicate two different facets of a criminal

_____

[24] This is not about whether Callahan lacked fair notice that Drumgold had alleged a due process violation based on the intentional use of (non-hotel and cash) false evidence, a claim that, if proved, could have fallen within the scope of Mooney and Pyle.

-64-

defendant's due process rights: under Mooney, the right to be free from a deliberately contrived conviction, and under Brady, the right to receive material exculpatory evidence known to the prosecution regardless of the prosecutor's good or bad faith.

The majority recognizes that this court has been "careful to distinguish" between the principles of Mooney and Brady. Yet the majority then goes on to elide this very distinction by treating "Drumgold's invocation of Brady as shorthand for his full complement of due process rights." This conflation of the two types of due process rights does not comport with our precedent. The only possible way to connect Drumgold's explicitly Brady-based claims regarding the hotel to his apparently Mooney-based claims regarding intentional framing would be to treat the hotel evidence as proof that Callahan had induced Evans to give perjured testimony. But, as I detail below, both juries found precisely to the contrary: they rejected the allegation that Callahan had elicited false statements from Ricky Evans about Evans's observations on the night of the murder. Without even this tenuous connection to Mooney, all that is left is a Brady claim, which is exactly how the parties argued the hotel question and how the district court decided Callahan's motion for judgment as a matter of law following the final 2009 verdict. That is why it is inappropriate for this court to now insert a Mooney argument where none existed before -- and even more, to do so to defeat immunity.

On this basis alone, Mooney and Pyle cannot provide a justification for denying Callahan immunity. But even if one were to accept arguendo that Mooney and Pyle may be brought late to the case, and the theory of liability altered on appeal, the juries' findings preclude the conclusion that these cases defeat Callahan's argument for qualified immunity. Under the facts as found by both the 2008 and 2009 juries, a reasonable police officer in Callahan's position in 1989 would not have known that his actions ran afoul of Mooney and Pyle, and, in fact, would have had every reason to think they did not.

The majority states that Mooney and Pyle identified a due process violation where the state procures a conviction by the knowing use of perjured testimony and the deliberate suppression of exculpatory evidence.[25] See Mooney, 294 U.S. at 112-13; Pyle, 317 U.S. at 216. Since the rule of these cases was clearly established

_____

[25] The majority characterizes this principle as "the deliberate suppression aspect of Brady." But Mooney and Pyle, having preceded Brady, cannot fairly be called an "aspect" of the latter case. While the Brady Court did describe its holding as an "extension" of Mooney and Pyle, see 373 U.S. at 86, the earlier cases stand for their own previously established proposition, which is independent of the later development of Brady and its progeny. As I have explained above, there are important differences between the due process rights identified in each line of cases.

In Mooney, the Court held that, after exhaustion of state remedies, the federal writ of habeas corpus is available to state prisoners who assert, with some colorable support, that state prosecutors knowingly used perjured testimony against them and then knowingly suppressed evidence which could have been used to counter the perjured testimony. See 294 U.S. at 109-10. Pyle, a very short opinion, merely states that such allegations are sufficient to state a claim for habeas corpus. See 317 U.S. at 215-16.

in 1989, the majority reasons, Callahan is not entitled to qualified immunity, because he deliberately suppressed evidence. That is not what the juries' findings establish. While, in my view, Callahan was entitled to qualified immunity as a legal matter when the district court erroneously denied it on Brady grounds, the juries' verdicts certainly meant he was entitled to immunity.

Drumgold's original complaint alleged that Callahan had fed Evans details of the crime and had "suggested" that Evans select Drumgold as the shooter from an array of photographs. The complaint separately alleged that Callahan had promised Evans assistance with his pending criminal charges and had failed to disclose the hotel or cash assistance.[26] But unlike in other cases where, because of their procedural postures, we have had to accept such allegations in the light most favorable to the plaintiffs, see, e.g., Haley, 657 F.3d at 46; Limone v. Condon, 372 F.3d 39, 43 (1st Cir. 2004), here we have the benefit of a jury's findings upon a fully developed record. As material to the purported Mooney and Pyle theory and the immunity question, those findings rejected all of Drumgold's relevant allegations.

The 2008 jury found that Callahan had not manufactured evidence, withheld evidence, or procured false statements regarding Evans's observations on the night of the murder, Evans's stay in

---

[26] The complaint did not allege that disclosure of the information about benefits would have revealed the allegedly manufactured testimony.

-67-

the hotel, or the disposition of Evans's criminal cases. That jury also rejected allegations that Callahan had manufactured evidence or procured false statements with regard to Mary Alexander and Tracie Peaks. These findings alone required immunity to be granted, as I explain.

The 2009 jury did not reconsider the allegations relating to witnesses other than Evans, and it found again that Callahan had not obtained any false statements from Evans regarding the night of the murder and had not withheld evidence relating to Evans's criminal charges. The 2009 jury did find that Callahan had withheld evidence regarding the housing and money provided to Evans. But as the majority has explained, withholding information about $20 was no constitutional violation at all.

The juries' findings clearly demonstrate that this is not a case about the deliberate creation of false evidence, the knowing submission of perjured testimony, or the attempt to frame an unwitting suspect -- that is, the types of misconduct contemplated by Mooney and Pyle. See, e.g., Limone, 372 F.3d at 44 (applying Mooney and Pyle to deny dismissal on qualified immunity grounds where plaintiff credibly alleged that police officers had developed a key witness's perjured testimony in order to cover for the real murderers). Rather, it is a case about affirmative disclosure obligations.

Mooney and Pyle did not clearly establish a rule governing what a police officer must affirmatively disclose; indeed, Brady itself recognized that the earlier cases did not establish affirmative disclosure obligations, as it described its own holding as "an extension" of Mooney. 373 U.S. at 86. Nothing in Mooney or Pyle would have put Callahan on notice that the Constitution required him to disclose that Evans had been housed at a hotel. In fact, that is a common accommodation to secure the attendance at trial of a prosecution witness, and hardly surprising information to the criminal bar.

In Limone, we held that, as of 1967, it was clearly established under Mooney that police officers were prohibited from "deliberately fabricating evidence and framing individuals for crimes they did not commit." 372 F.3d at 45, 47-48. A reasonable officer in Callahan's position in 1989 would not have viewed the alleged nondisclosure of the hotel accommodations as falling within that proscription. Such an officer would have viewed those actions as, if anything, falling under Brady, and no contemporaneous case law held to the contrary.

The Supreme Court has recently reiterated that to deny qualified immunity, "existing precedent must have placed the statutory or constitutional question beyond debate." Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2083 (2011). The majority's conclusions cannot be squared with this command.

Although <u>Mooney</u> and <u>Pyle</u> may support a denial of qualified immunity where, at the motion to dismiss stage, the plaintiff has credibly alleged that the police committed a particularly egregious act of deliberately concealing material exculpatory evidence from prosecutors, <u>see</u> <u>Haley</u>, 657 F.3d at 49-51, this is not such a case. Nor is it even close to being such a case. The juries' findings do not permit any inference that Callahan's actions were part of an attempt to frame Drumgold through perjured testimony. Because the juries rejected the claim that Callahan had procured false statements from Evans about the night of the murder, the framing theory must fall away. If Callahan did not induce Evans to lie, the hotel lodging could not have been evidence of an inducement to lie.

Further, in the instances where the juries did find that Callahan withheld evidence, they made no express finding that Callahan acted with the purpose of suppressing such evidence. The holdings of <u>Mooney</u>, <u>Pyle</u>, and their progeny prohibit behavior that is characterized by specific intent: they hold that state actors, knowing that certain evidence or testimony is false, must not deliberately use that evidence for the purpose of obtaining a tainted conviction.[27] Because 42 U.S.C. § 1983 does not provide a

---

[27] <u>See</u> <u>Mooney</u>, 294 U.S. at 112 ("[D]ue process . . . cannot be deemed to be satisfied . . . if a state has contrived a conviction through the pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known

source of substantive rights, but rather provides "a method for vindicating federal rights elsewhere conferred," <u>Baker</u> v. <u>McCollan</u>, 443 U.S. 137, 144 n.3 (1979), a § 1983 plaintiff who alleges a violation of the constitutional principle recognized in <u>Mooney</u> and <u>Pyle</u> must prove that the defendant had the state of mind those cases require.  See <u>Graham</u> v. <u>Connor</u>, 490 U.S. 386, 394 (1989) ("The validity of the [§ 1983] claim must . . . be judged by reference to the specific constitutional standard which governs that right.").  Given all of the ambiguity as to disclosure obligations outlined above, as well as the juries' findings, this record requires that immunity be granted.

It is clear that there was no finding of specific intent. Not only were the district court's jury instructions on state of

_____

to be perjured."); <u>Pyle</u>, 317 U.S. at 215-16 ("Petitioner's papers are inexpertly drawn, but they do set forth allegations that his imprisonment resulted from perjured testimony, knowingly used by the State authorities to obtain his conviction, and from the deliberate suppression by those same authorities of evidence favorable to him."); <u>Napue</u> v. <u>Illinois</u>, 360 U.S. 264, 269 (1959) (recognizing "[t]he principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction"); <u>Limone</u>, 372 F.3d at 45 ("[T]hose charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit."); <u>Haley</u>, 657 F.3d at 49 ("Deliberate concealment of material evidence by the police, designed to grease the skids for false testimony and encourage wrongful conviction, unarguably implicates a defendant's due process rights.").  Compare Brady, 373 U.S. at 87 (specifying that the due process right recognized in that case applies "irrespective of the good faith or bad faith of the prosecution").

mind confusing or even contradictory in both trials,[28] but because the court stated that it was supposed to be giving a <u>Brady</u> instruction, the particular state of mind requirements of <u>Mooney</u> and <u>Pyle</u> never entered the picture. The 2008 verdict slip, which essentially exonerated Callahan, made no reference to his state of mind at all. The 2009 verdict slip asked whether Callahan "intentionally or recklessly" withheld evidence, so the jury could have found liability without finding specific intent.[29]

---

[28] In 2008, the trial judge told the jury that in order to find a § 1983 violation, "it's not necessary to find that the defendants had any specific intent to deprive the plaintiff of his constitutional rights[.] . . . [T]he plaintiff is entitled to relief if the defendant intended the actions which resulted in a violation of his constitutional right." Yet the judge later instructed that "[i]n order to prevail on a claim that defendants suppressed exculpatory evidence, the plaintiff must prove that one or both of the defendants knew of certain material exculpatory evidence and intentionally and deliberately withheld the information from the prosecutor." Callahan's counsel pointed out this contradiction in a colloquy just before closing arguments and objected to the instructions after they were given. In the 2009 trial, the judge first instructed the jury that the § 1983 charge required Drumgold to show "that the defendant either intentionally or recklessly committed the action which then resulted in a violation of the plaintiff's constitutional rights," then that Callahan would be liable if he "knowingly and deliberately withheld any material exculpatory evidence from the prosecutor."

[29] I do not agree with the majority's suggestion that recklessness is sufficient to satisfy Mooney's (and related cases') state of mind requirement. The case that the majority cites for this proposition, Tennison v. City and County of San Francisco, 570 F.3d 1078 (9th Cir. 2009), addressed the state of mind required to show a Brady-based § 1983 violation in a situation where Brady was held to apply to police inspectors. See id. at 1087-88. As detailed above, the Mooney and Pyle standard is distinct from the Brady standard. The fact that Callahan invoked "recklessness" in his memorandum of law regarding jury instructions is of no moment when the standard he invoked was inapplicable.

Beyond that, the evidence at trial showed that, in 1989, Callahan had informed at least one member of the district attorney's office about Evans's staying in the hotel, although he apparently did not tell the specific prosecutor in the Drumgold murder trial. See Drumgold, 806 F. Supp. 2d at 410-11 & nn.5-6. This evidence of disclosure demonstrates that Callahan was not deliberately hiding the information from the district attorney's office in order to procure Drumgold's conviction.[30]

Under these circumstances, it unduly strains the principle recognized in Mooney and Pyle to hold that a reasonable officer in Callahan's position would have known that failing to disclose the hotel evidence would be a violation of Drumgold's due process rights. Where, as here, the jury's findings do not permit

---

[30] In denying Callahan's 2009 post-trial motion for qualified immunity, the district court relied on the theory that Callahan had failed to fulfill his Brady obligation because he had reported the hotel information to the wrong prosecutor. Drumgold, 806 F. Supp. 2d at 418-19. This was incorrect under Brady and is even more so under Mooney and Pyle.

The answer to the question of to whom (and how) a police officer ought to disclose potentially exculpatory evidence was not clearly established in 1989, and it is still not clearly established today. Neither party, nor the district court, provided controlling authority or even anything approaching a consensus of persuasive authority on this issue. See Wilson v. Layne, 526 U.S. 603, 617 (1999). There was no support for denying qualified immunity on this basis, even under the district court's Brady-based reasoning. And under the majority's non-Brady theory, if a reasonable officer in Callahan's position truthfully disclosed evidence to the district attorney's office -- even if the disclosure were later adjudged to be legally insufficient -- he would reasonably believe that he was not violating Mooney and Pyle's prohibition of intentional framing.

-73-

a theory of intentional framing, nor include a finding of the requisite knowledge or intent, the pre-Brady cases are not on point. To hold otherwise is to blur the line between Brady's no-fault nondisclosure obligation and Mooney and Pyle's proscription against the knowing and deliberate use of false evidence.

This is exactly the kind of situation for which qualified immunity was designed, even against the background of Haley and Limone. Callahan's circumstances are a far cry from those alleged in those two cases, where plaintiffs claimed that the police were "intentionally framing an accused person" by a "deliberate attempt to secure a conviction, without regard to actual guilt or innocence," Haley, 657 F.3d at 46 -- not that the police disclosed evidence in a less-than-thorough manner. The doctrine of qualified immunity "protects all state actors except 'the plainly incompetent [and] those who knowingly violate the law.'" Haley, 657 F.3d at 47 (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). The juries' findings reveal that Callahan does not fall into either category. Remanding the case for yet a third trial, when Callahan was clearly entitled to qualified immunity no later than the first trial, denies him the benefit of those juries' findings, in violation of his Seventh Amendment rights and his immunity rights. Callahan is entitled to qualified immunity, and judgment should enter for him on that basis.

-74-

B.  The Scope of the 2009 Retrial

The district court erred in ordering a retrial of the hotel issue before the second jury, abusing its discretion.  It did so in derogation of Callahan's Seventh Amendment rights.  The retrial jury should not have been permitted to reexamine the question of whether Callahan withheld the hotel evidence, since that question was resolved in his favor during the 2008 trial.  That question was not so inextricably intertwined with the money issue as to require a full retrial.  The district court should have ordered a retrial on the money issue only: that is, the court should have asked the second jury to determine whether Callahan had deliberately suppressed evidence that he gave Evans money, the amount of such money (if any), whether the sum was material, and whether the withholding of that information caused Drumgold's injury.

In the 2008 trial, the district court divided the jury deliberations into two phases.  In the first phase (the "violation" phase), the jury was to decide, inter alia, whether Callahan violated Drumgold's right to a fair trial by withholding evidence that Callahan arranged free housing for Evans and/or that Callahan gave Evans "substantial amounts of money."[31]  If the jury answered

[31] The relevant special verdict questions read as follows:

Has the Plaintiff, Shawn Drumgold, proven by a preponderance of the evidence that Defendant Timothy Callahan violated his right to a fair trial by

"yes" to either or both of these questions, the second phase (the "causation" phase) would ask the jury to decide whether such withholding was the cause of Drumgold's injury. The 2008 jury thus potentially faced four questions: (1) whether Callahan withheld housing evidence; (2) whether Callahan withheld money evidence; (3) whether withholding the housing evidence caused Drumgold's injury; and (4) whether withholding the money evidence cause Drumgold's injury.

In the first phase, the 2008 jury determined that Callahan had not withheld evidence regarding the housing but had withheld evidence regarding the money; that is, it answered "no" to question 1 and "yes" to question 2. Following the verdict in the first phase, the parties declined the district court's suggestion that the jury be instructed to clarify what amount of money constituted a "substantial amount." In the second phase of deliberations, the jury never reached question 3 because it had answered "no" to question 1. It then hung on question 4: whether

withholding exculpatory evidence from prosecutors, manufacturing evidence, and/or obtaining false statements regarding Ricky Evans being housed at a hotel and provided with meals?

Has the Plaintiff, Shawn Drumgold, proven by a preponderance of the evidence that Defendant Timothy Callahan violated his right to a fair trial by withholding exculpatory evidence from prosecutors, manufacturing evidence, and/or obtaining false statements regarding Ricky Evans being given substantial amounts of money?

Callahan's provision of money to Evans had caused Drumgold's injury.

After the district court declared a mistrial, Callahan moved for entry of final judgment as to, inter alia, the housing issue, and he sought to restrict the scope of the retrial to the causation question with regard to the money.  Because the housing issue was separate from the money issue and had been decided by a jury, it should not have been retried.

The district judge, however, denied Callahan's motion, stating that a limited retrial which did not reopen the housing questions was not feasible because

> [a] second jury would obviously have to be instructed that Callahan had violated Drumgold's civil rights by giving him "substantial amounts of money" and not disclosing it.  The jury would be left with the ambiguity of what "substantial money" meant -- an issue wholly unresolved in the first trial, notwithstanding the Court's efforts to seek further clarification.  And the only way to resolve that ambiguity would be to relate each side's evidence concerning the treatment of Ricky Evans . . . .  In short, all aspects of Ricky Evans's portion of this case would be involved.

On this basis, the district judge allowed the retrial jury to revisit both "violation" questions -- that is, whether Callahan had failed to disclose that he had given housing benefits to Evans and whether he had failed to disclose that he had given money to Evans. This rationale does not in fact explain why the housing issue should have been subject to retrial.

A partial retrial is permissible under the Seventh Amendment when some, but not all, issues in a case have been properly and conclusively resolved by a jury verdict. Gasoline Prods. Co. v. Champlin Refining Co., 283 U.S. 494, 500 (1931). In order for a partial retrial to be appropriate, it must "clearly appear[]" that the remaining issues are "so distinct and separable from the others that a trial of [them] alone may be had without injustice." Id.

The decision whether to grant a full or a partial retrial is generally committed to the discretion of the trial judge, see Sprague v. Boston & Me. Corp., 769 F.2d 26, 28 (1st Cir. 1985), and thus our review is for abuse of discretion, see Winn v. Lafayette Town House, 839 F.2d 835, 837 (1st Cir. 1988); Sprague, 769 F.2d at 28. An error of law, here an error as to the dictates of Gasoline Products, constitutes an abuse of discretion. A district court may also abuse its discretion when it misapprehends the nature of the relationship between the issues sought to be retried, Winn, 839 F.2d at 836-37, or when it does not give an adequate basis in the record for its determination that a full retrial is necessary, Crane v. Consol. Rail Corp., 731 F.2d 1042, 1049-51 (2d Cir. 1984) (Friendly, J.). All three of these types of problems appear in the district court's retrial order.

First, neither of the primary rationales for ordering a full rather than a partial retrial are present here. Generally, a

full retrial is necessary when (1) the original verdict represented a compromise among jurors who could not otherwise agree on multiple issues, or (2) the error infecting one issue in the verdict likely spread to the others. See 11 Wright & Miller, Federal Practice & Procedure § 2814 (2012); see also Phav v. Trueblood, Inc., 915 F.2d 754, 767-68 (1st Cir. 1990) (explaining compromise verdicts and citing cases). Indeed, in Vizzini v. Ford Motor Co., 569 F.2d 754 (3d Cir. 1977), the court observed that partial retrials should be granted "only in those cases where it is plain that the error which has crept into one element of the verdict did not in any way affect the determination of any other issue." Id. at 760 (quoting Romer v. Baldwin, 317 F.2d 919, 922-23 (3d Cir. 1963)) (internal quotation marks omitted).

Significantly, when a jury answers special interrogatories rather than giving a general verdict, courts have more readily preserved the jury's findings and ordered partial rather than full retrials. See, e.g., LaPlante v. Am. Honda Motor Co., 27 F.3d 731, 738 (1st Cir. 1994) (remanding for new trial only on liability and not on damages, where damages award was distinct and separable, "particularly" because the first jury answered "detailed interrogatories" on how it arrived at the damages number). In Crane v. Consolidated Rail Corp., 731 F.2d 1042, Judge Friendly noted that when a trial court uses special interrogatories, the "trial or reviewing court may be reasonably

certain that an erroneous verdict was reached independent of another verdict," and unless there are "obvious inconsistencies," the court should presume that each of the jury's answers is a "good faith response[] to the question[] presented." Id. at 1050 (quoting Akermanis v. Sea-Land Serv., Inc., 688 F.2d 898, 906 (2d Cir. 1982)) (internal quotation mark omitted).

There were no inconsistencies here, much less obvious ones. Neither party has argued that the 2008 jury was confused when it gave its special verdict answers, or that the jury's indecision on causation as to the money "infected" its decision about the lack of violation as to housing. Nor was that the rationale of the trial judge in the order on the scope of the retrial.

This is also not a situation where, considering the totality of the circumstances, the issues were too "interwoven" to retry one issue separately. See 11 Wright & Miller § 2814. This case does not involve the much more common retrial issue of the "interwovenness" of liability and damages, see id., nor even the (somewhat more analogous) interwovenness of violation and causation, see, e.g., Bohack Corp. v. Iowa Beef Processors, Inc., 715 F.2d 703, 709 (2d Cir. 1983) (affirming district court's order of full retrial on Robinson-Patman Act claims after first jury found that defendant violated the Act but hung on whether violation caused plaintiff's injury). Rather, the problem is the purported

interwovenness of two distinct substantive issues -- i.e., the hotel and the cash.

In ordering a retrial on both of those issues, the district court departed from Gasoline Products Co. v. Champlin Refining Co., 283 U.S. 494, the very case that established the constitutional propriety of partial retrials. That case demonstrates that separate claims involving a shared set of facts can fairly be, and should be, separated on retrial. In Gasoline Products, the plaintiff's claim alleged breach of a license contract, and the defendant's counterclaim alleged that the license contract was executed in consideration for separate oral and written contracts that the plaintiff had breached. Id. at 495-96. While the Supreme Court held that liability and damages on the counterclaim were too "interwoven" to retry separately, id. at 500, it did not so hold with regard to the relationship between the claim and counterclaim, even though a retrial on the counterclaim would likely have included factual allegations relating to the license contract.

Similarly, in Drumgold's case, the first jury's answers to the special verdict questions show that the first jury was able to separate the two "violation" issues even though they involved a shared set of facts. In other words, while it may have risked confusion to ask the second jury to evaluate causation on the money question without also evaluating violation on the money question,

there is no indication that a retrial jury would have been confused if it were asked to evaluate the entire money question without being allowed to reopen the hotel disclosure issue. The presence of an overlapping factual background to distinct issues is not enough to overcome the Seventh Amendment and retry an issue already determined by a jury.

If necessary in order to fairly present Drumgold's case, evidence as to the circumstances under which Callahan gave cash to Evans, including some evidence of the housing, could have been admitted at the second trial without having to reopen the hotel violation issue. The jury could have been instructed that Callahan had not withheld evidence about the housing and had not violated any rights in that regard, and that that issue was not open; any hotel evidence was limited to providing background. Juries are often asked to accept evidence for one purpose but not another, see Fed. R. Evid. 105; United States v. Tse, 375 F.3d 148, 157-58 (1st Cir. 2004), and we presume that juries will follow the instructions that the district court gives them, United States v. Griffin, 524 F.3d 71, 78 (1st Cir. 2008). Here, the district court even recognized this possibility, initially stating that the second trial could "cover the entire story [of Evans and Callahan], but the only question that that jury would be asked is about the money." Indeed, the judge followed an almost identical course with

regard to the use in the second trial of evidence about Tracie Peaks and Mary Alexander.

The trial judge also could have avoided jury confusion by limiting the introduction in the second trial of certain evidence specifically pertaining to the hotel, on the ground that, given a retrial of limited scope, such evidence's probative value was substantially outweighed by the risk of confusing or misleading the jury into considering questions not before it. See Fed. R. Evid. 403.

The district court's order on the scope of the retrial does not seriously consider these possibilities, nor explain the relevant distinctions between the violation and causation questions, nor point to evidence in the record supporting the proposition that retrying both the hotel and money issues in their entirety was necessary to prevent jury confusion. The order explains why a causation-only retrial would be unworkable, but it fails to explain why that means that the hotel-violation question should be reopened. The court merely states that "all aspects of Ricky Evans's portion of this case would be involved" in a retrial because of the ambiguity of the first jury's finding of "substantial amounts" of money. The order does not explain why this situation would make the hotel issue inextricable from the money issue. See Crane, 731 F.2d at 1050 ("The memorandum opinion of the district judge . . . casts little light on why a retrial of

the damages issue was thought to be necessary."). This was not merely, as the majority suggests, the lack of an "extensive elaboration"; it was a failure to justify the basic choice at the heart of the district court's decision, a choice which I think cannot be justified.

This outcome constitutes an abuse of discretion. In <u>Winn v. Lafayette Town House</u>, 839 F.2d 835, the appellate court reversed the district court's grant of a full retrial on both liability and damages because the district court confused the relationship between comparative fault (a liability issue) and equitable reduction (a damages issue) in a case under a state comparative negligence statute. <u>Id.</u> at 836-37. In <u>Crane</u>, Judge Friendly reversed the district court's grant of a new trial on both liability and damages because the court had not shown an adequate basis in the record for its determination that the jury's verdict on damages was tainted by an error she correctly discerned in the liability verdict. 731 F.2d at 1049-51. Likewise, in this case, the district court abused its discretion by failing to provide a reasoned basis for the legal distinctions underlying its ruling on the scope of the retrial.

As Judge Friendly cogently noted,

> [S]omething more is required to upset a verdict than the conclusory language . . . used by the district judge. While we must guard against usurping the trial court's prerogative with respect to seriously erroneous jury verdicts, we must be equally

> diligent in protecting the jury's function. Direction of a new trial on an issue determined by a jury without the articulation of a sufficient basis for such action effects . . . "a denigration of the jury system[,] and to the extent that new trials are granted the judge takes over, if [s]he does not usurp, the prime function of the jury as the trier of the facts."

Id. at 1051 (quoting Lind v. Schenley Indus., Inc., 278 F.2d 79, 90 (3d Cir. 1960)).  In light of the fact that the first jury was able to separate the hotel and money violation questions, the district court's explanation for why the second jury would be unable to do so was inadequate to support the decision to set aside a legitimate jury verdict.

The second trial should have been limited to the money issue only.  Since Callahan's provision of $20 to Evans was not material, the second jury's verdict on the money issue cannot support a finding of liability for Callahan.  He was entitled to judgment as a matter of law.

### III.

I dissent from the majority's decision to remand this case for a third trial.  I would reverse the district court's denial of Callahan's renewed motion for judgment as a matter of law and its denial of qualified immunity, and order entry of judgment for Callahan.